ELECTRONICALLY FILED
Hot Spring County Circuit Court
Teresa Pilcher, Hot Spring County Circuit Clerk
2023-Feb-02  14:47:23
30CV-23-39
C07D01 : 97 Pages

## IN THE CIRCUIT COURT OF HOT SPRING COUNTY
## CIVIL DIVISION

**CRYSTAL MERRITT, on behalf of herself
and all other Arkansas Tax Payers**                    **PLAINTIFFS**

**VS .**

**WELLPATH, LLC;  and,
THE ARKANSAS DEPARTMENT OF CORRECTIONS**          **DEFENDANTS**

### COMPLAINT

Comes the Plaintiff, **CRYSTAL MERRITT,** through counsel, **SUTTER & GILLHAM,**

**P.L.L.C.;** and, for this Complaint, states as follows:

### PARTIES AND JURISDICTION

1.      Plaintiff is a resident and citizen of Hot Spring County, Arkansas, who worked for

Defendants, **WELLPATH, LLC**   and **THE ARKANSAS DEPARTMENT OF**

**CORRECTIONS,** in Hot Spring County, Arkansas.  This is an action brought under the Freedom

of Information Act and for illegal exaction.

2.      This is an action for illegal-exaction brought .pursuant to Article 16, Section 13, of

the Arkansas Constitution to protect the taxpayers of the State of Arkansas from alleged misuse of

public funds by the Arkansas Municipal League to provide liability coverage for the City of

Blytheville and other public entities in the State of Arkansas to protect the Plaintiff and the

travelling public. Our common law makes an  illegal-exaction suit under Article 16, Section 13, of

the Arkansas Constitution a class action as a matter of law. *Worth v. City of Rogers,* 351 Ark. 183,

89 S.W.3d 875 (2002). An illegal-exaction claim is by its nature in the form of a class

action. *Id.* An illegal-exaction suit is a constitutionally created class of taxpayers, and suit is

brought for the benefit of all taxpayers. *Id.*

EXHIBIT
1

3.      Defendant, Wellpath, LLC, is a foreign entity who contracts with The Arkansas Department of Corrections, an instrumentality of the State of Arkansas, to perform a public function. Accordingly, venue is proper, and this Court has subject matter jurisdiction.

## GENERAL ALLEGATIONS OF FACT

4.      Plaintiff is a resident and citizen of Arkansas who has paid taxes.

5.      The Arkansas Department of Correction is an instrumentality of the State of Arkansas, who contracted with Well Path to meet its non-delegable duty of providing appropriate health care to inmates.

6.      However, Defendant has failed and refused to provide appropriate health care to inmates, as well as failed and refused to meet its obligations required under its contract with the Arkansas Department of Corrections.  One example is the Complaint attached as *Exhibit "A."*

7.      Specifically, the Contract attached as *Exhibit "B"* requires Well Path to maintain insurance and indemnify the State.

8.      Despite demand, Defendant, Well Path, refused to indemnify the State or Ms. Brown in Marziale vs. Brown.

9.      Indeed, Plaintiff has witnessed WellPath's failures, since she worked for Well Path as an LPN.

10.      Plaintiff requested her file from WellPath, under the Freedom of Information Act, but Well Path refused to provide her with the file.  Again, such violation is a violation of the Contract between WellPath and the State such that there has been an illegal exaction in that the State contracted .

11.      WellPath has taken State money and but has failed to perform in accordance with United States Constitution and its Contract with the Arkansas Department of Corrections.

## COUNT I

12.    Plaintiff realleges the foregoing as if more fully set out herein.

13.    In compliance with the law, Plaintiff orally requested that Well Path provide her with her personnel file on all documents associated with her termination.

14.    Well Path failed and refused to comply with Plaintiff's FOIA request.

15.    Consequently, Plaintiff seeks an immediate production of her personnel file and all documents associated with her termination, as required by the Arkansas Freedom of Information Act.

## COUNT II

16.    Plaintiff realleges the foregoing as if more fully set out herein.

17.    Plaintiff is an Arkansas taxpayer.

18.    "Illegal Exaction' means far more than the mere collection of unlawfully levied taxes. With little limitation, almost any misuse or mishandling of public funds may be challenged by a taxpayer action. Even paying too much for cleaning public outhouses has been held by our courts as basis for a taxpayer's right to relief, Dreyfus v. Boone, 88 Ark. 353, 114 S.W. 718. Any arbitrary or unlawful action exacting taxes or tax revenues may be restrained and annulled by a taxpayer affected by such procedure, Bush v. Echols, 178 Ark. 507, 10 S.W.2d 906; McClellan v. Stuckey, 196 Ark. 816, 120 S.W.2d 155; Park v. Hardin, 203 Ark. 1135, 160 S.W.2d 501; Brookfield v. Harahan Viaduct Improvement District, 186 Ark. 599, 54 S.W.2d 689.

19.    'The remotest effect upon the taxpayer concerning any unlawful act by a tax supported program or institution may be enjoined under Article XVI, Section 13, of the Constitution of the State of Arkansas, Green v. Jones, 164 Ark. 118, 261 S.W. 43. * * *

20.    'Our Court thoroughly discussed 'illegal exaction' in the case of Arkansas Association of County Judges v. Green, 232 Ark. 438, 338 S.W.2d 672, wherein jurisdiction of the Chancery Court was questioned and illegal exaction was involved. This Court stated that the theory of an illegal exaction does not necessarily involve an illegal tax citing the case of Lee County v. Robertson, 66 Ark. 82, 48 S.W. 901, wherein the Court was not dealing with illegal tax, but with the question of illegal use or appropriation of county funds.   This is that type of case.

21.    'The case of Arkansas County Judges Association v. Green cited the case of Ward v. Farrell, 221 Ark. 636, 253 S.W.2d 353, wherein our Court stated concerning the involved Constitutional provision: "There is eminent authority for holding, even in the absence of an express provision of the Constitution, such as referred to above, that a remedy is afforded in equity to taxpayers to prevent misapplication of public funds on the theory that the taxpayers are the equitable owners of public funds and that their liability to replenish the funds exhausted by the misapplication entitles them to relief against such misapplication."

22.    Here, Wellpath has misapplied public money such that an illegal exaction has occurred, and Wellpath should be ordered to disgorge the money it had fraudulently spent.

## JURY DEMAND

23.    Plaintiff(s) pray for a trial by jury.

## PRAYER

**WHEREFORE,** Plaintiff, **CRYSTAL MERRITT,** on behalf of herself and all other Arkansas Tax Payers pray this Court order Wellpath to disgorge the public money it has received, for fees, for an Order requiring compliance with the FOIA, for costs, and for all other proper relief..

Respectfully submitted,

By:

Luther O. Sutter, Esq., ARBN 95031
Lucien R. Gillham, Esq., ARBN 99199
**SUTTER & GILLHAM, P.L.L.C.**
Attorneys for Plaintiff
1501 N. Pierce, Ste. 105
Little Rock, AR 72207
501/315-1910  Office
501/315-1916  Facsimile
Luther.sutterlaw@gmail.com
Lucien.gillham@gmail.com

12/20/22, 3:01 PM                    CommonSpirit Health Mail - Fw: [EXT] Merritt Employment files

**CommonSpirit**                                    Crystal Merritt AR-MALVERN <crystal.merritt@commonspirit.org>

## Fw: [EXT] Merritt Employment files
1 message

**Crystal Merritt** <lostchic99@yahoo.com>                    Tue, Dec 20, 2022 at 3:00 PM
Reply-To: Crystal Merritt <lostchic99@yahoo.com>
To: "Crystal.merritt@commonspirit.org" <Crystal.merritt@commonspirit.org>

**USE CAUTION - EXTERNAL EMAIL**

Sent from Yahoo Mail on Android

---- Forwarded Message ----
**From:** "Robert Deocales" <RDeocales@Wellpath.us>
**To:** "Crystal Merritt" <lostchic99@yahoo.com>
**Sent:** Wed, Aug 17, 2022 at 9:17 AM
**Subject:** RE: [EXT] Merritt Employment files

Ms. Merritt,

We do not release them at all unless ordered by the court.

**ROBERT D. DEOCALES, PHR, SHRM-CP**

Senior Human Resources Business Partner

# wellpath

**To hope and healing.**

3340 Perimeter Hill Drive // Nashville, TN 37211
**O** 615.324.5741 // **M** 615.970.9442
LinkedIn // Facebook // Twitter // Instagram // YouTube

www.wellpathcare.com // www.wellpathcarecenters.com



EXHIBIT
A

**From:** Crystal Merritt <lostchic99@yahoo.com>
**Sent:** Wednesday, August 17, 2022 9:15 AM
**To:** Robert Deocales <RDeocales@Wellpath.us>
**Subject:** Re: [EXT] Merritt Employment files

---

**CAUTION: This Email is from an EXTERNAL source. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Report suspicious messages to SPAM@Wellpath.us**

---

How do I get them? Pinebluff office?

Sent from Yahoo Mail on Android

On Wed, Aug 17, 2022 at 9:07 AM, Robert Deocales

<RDeocales@Wellpath.us> wrote:

Ms. Merritt,

Wellpath does not release employment files in the state of Arkansas.

ROBERT D. DEOCALES, PHR, SHRM-CP

Senior Human Resources Business Partner

# wellpath

To hope and healing.

3340 Perimeter Hill Drive // Nashville, TN 37211
**O** 615.324.5741 // **M** 615.970.9442
LinkedIn // Facebook // Twitter // Instagram // YouTube

www.wellpathcare.com // www.wellpathcarecenters.com

**From:** HRBPquestions <hrbpquestions@wellpath.us>
**Sent:** Wednesday, August 17, 2022 8:44 AM
**To:** Robert Deocales <RDeocales@Wellpath.us>
**Subject:** FW: [EXT] Merritt Employment files

Hi Robert,

Please see the below message.

Thanks,

**APRIL FAULK-MANNINGS**

Human Resources Coordinator



**To hope and healing.**

3340 Perimeter Hill Drive // Nashville, TN 37211
**O** 615-466-3512
LinkedIn // Facebook // Twitter // Instagram // YouTube

www.wellpathcare.com // www.wellpathcarecenters.com

**From:** Crystal Merritt <lostchic99@yahoo.com>
**Sent:** Wednesday, August 17, 2022 8:32 AM
**To:** HRBPquestions <hrbpquestions@wellpath.us>
**Subject:** [EXT] Merritt Employment files

---

> **CAUTION: This Email is from an EXTERNAL source. Do not click links or open attachments unless you recognize the sender and know the content is safe.  Report suspicious messages to SPAM@Wellpath.us**

---

I, Crystal Merritt, am requesting a copy of my employment file/files. I worked at ORCU-SNU Malvern Ar. If any additional information is needed from me please feel free to reach out via email or phone (501) 762-3478. Thanks

Crystal R. Merritt

Sent from Yahoo Mail on Android



**wellpath**
The New CCS+CMGC.

7/15/2022

To Whom It May Concern:

I am writing to you today in regard to a nurse that previously worked at our facility. Ms. Crystal Merritt worked with me at Ouachita River Special Needs Unit. She was such a strong addition to our team. I think it is important to note some things about our facility. This is a large correctional facility. Our prison has the name special needs unit because our population is comprised of incarcerated patients throughout the state with high acuity medical needs. We care for patients diagnosed with end stage dialysis, multiple sclerosis, cancer and hemophilia to name a few. The majority of our population is being treated for at least one but usually multiple chronic conditions.

Ms. Merritt worked as an LPN in the ORSNU Day Clinic. The Day Clinic is a mix of ER, urgent care and a Dr. Office. The patient acuity at our unit is high and very demanding. Our patient population is comprised of the sickest inmates in the state. They transfer here from other units to receive the specialized medical care that we are able to provide. Our nurses are challenged daily and Ms. Merritt has always risen to the occasion. She is dedicated both to her patients and her coworkers. To say she is calm under pressure is an understatement. Ms. Merritt handles emergencies with a calm and assuring approach that demonstrates her leadership skills. Her patient interactions are warm and empathetic, which demonstrates her true dedication to being a patient advocate. She is organized and demonstrated adherence to the attendance policy. Ms. Merritt was quick to take on responsibility and completed tasks assigned to her.

This short letter could not possible convey all of Ms. Merritt's positive attributes. Please let me know if I can provide any further information.

Sincerely,

Crystal McCoy, RN, HSA

Wellpath
1283 Murfreesboro Road
Suite 500
Nashville, TN 37217



ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2022-Jun-29 15:33:34
35CV-18-660
C11WD01 : 12 Pages

## *UNIFORM COVER PAGE*
[To be used when required by Administrative Order No. 2 (g)★]

COURT:    ___CIVIL___ COURT OF __JEFFERSON_____ COUNTY

Docket/Case Number:  ____35CV-18-660_____

CASE NAME:
PLAINTIFF/
PETITIONER:        _____CHRISTINA MARZIALE et al_____

DEFENDANT/
RESPONDENT:        ___TENISHA BROWN et al_____

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):        _____EXHIBIT 1_____

★Administrative Order No 2.
     (g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).
     (2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.



## AGREEMENT FOR COMPREHENSIVE INMATE/OFFENDER
## HEALTH SERVICES

This Agreement, made this 25th day of September 2013 is entered into by and among the State of Arkansas Department of Correction ("ADC"); the State of Arkansas Department of Community Correction ("DCC"); and Correct Care Solutions, LLC ("CCS"), a Kansas limited liability company with offices located at 1283 Murfreesboro Road, Suite 500, Nashville, Tennessee 37217 (the "Agreement"). ADC, DCC and CCS collectively may be referred to in this Agreement as "Parties" and individually as a "Party."

WHEREAS, pursuant to Arkansas Code Annotated § 12-29-401 and other statutory authority, ADC and DCC are responsible for establishing, administering, and managing the healthcare delivery program within the State of Arkansas correctional system; and

WHEREAS, ADC and DCC have undertaken the foregoing statutory obligations and desire to operate the inmate health services program in a professional manner with respect for the inmates' right to necessary healthcare services in accordance with applicable American Correctional Association ("ACA") standards; applicable regulations of the State of Arkansas Department of Health ("ADH"); applicable state and federal laws and regulations; ADC and DCC policies and procedures; and applicable court orders/opinions relating to the State of Arkansas correctional system; and

WHEREAS, ADC and DCC intend to deliver healthcare to inmates consistent with the standards described above; and

WHEREAS, ADC and DCC issued Request for Proposal No. 2013-C8494 (the "RFP") outlining requirements for the provision of healthcare services for inmates and soliciting bids from contractors to provide such services; and

WHEREAS, CCS responded to the RFP with its Technical Proposal (the "Proposal") to meet the requirements of the RFP and to offer its services on a contractual basis; and

WHEREAS, pursuant to Arkansas Code Annotated §§ 12-27-142 & 12-50-106, ADC and DCC may enter into an agreement for the provision of healthcare services for inmates; and

WHEREAS, ADC and DCC wish to engage CCS to provide correctional healthcare and healthcare management services to inmates under their respective custody and control pursuant to the RFP and Proposal; and

WHEREAS, CCS desires to provide such services according to the terms and conditions of the RFP and as herein stated.

1





EXHIBIT
1

NOW, THEREFORE, for and in consideration of the mutual agreements as hereafter set forth, the Parties agree as follows:

ARTICLE I

DEFINITIONS

For the purposes of this Agreement, the following definitions are established:

1.1   **ADC/DCC Operated/Managed Facilities:**   means and refers to those operational units of ADC and DCC which are fully functional at the time of the initiation of this Agreement.  The addition of facilities not currently operational will be addressed per the RFP.

1.2   **Administrative Count:** refers to the actual number of inmates occupying an ADC or DCC operated/managed facility or facility housing inmates under special arrangement on behalf of ADC on any day.

1.3   **Average Daily Population:** refers to the sum total of all administrative counts performed during a calendar month divided by the number of administrative counts performed during a calendar month.  For purpose of reference, an administrative count is performed at 12:00 midnight each regular scheduled workday, Monday through Friday, excluding State holidays.

1.4   **Business Day:**  refers to any day, Monday through Friday, generally 8:00 a.m. to 5:00 p.m., which comprises the usual and customary work week, excluding holidays observed by ADC/DCC.

1.5   **Comprehensive:**  means encompassing all departments, services, disciplines, and personnel engaged in patient care.

1.6   **Comprehensive Health Program for ADC:**   refers to comprehensive medical and dental services required to prevent, treat or prevent deterioration of a medical and/or dental condition/illness, maintain an inmate's ongoing health status, and prevent the spread of a disease or condition.  Mental health services provided under this agreement are limited to psychiatry and the treatment of dementia.

1.7   **Comprehensive Health Program for DCC:**  As above with the additional services to identify any organic, mental, or emotional impairment having substantial adverse effect on an inmate's cognitive or volitional functions.

1.8   **Daily Physician/Dentist Coverage:** shall mean and refer to the availability of a physician and/or dentist, on the premises of an ADC or DCC operated/managed facility, for the purpose of rendering care or treatment pursuant to health complaints registered by inmates during normal work hours, generally, 8:00 a.m. to 5:00 p.m. Monday through Friday.

1.9   **Emergent Transportation:** defined as transportation for an acute illness or injury in which life, limb, or bodily functions are at imminent risk of irreparable

2

deterioration or death and constant monitoring and supervision by trained healthcare professionals are needed during the transportation.

1.10    **FTE**: means 'full time equivalent' and refers to the performance of two thousand and eighty (2080) man-hours of regularly scheduled work performed at an assigned task/post during a twelve (12) month period, or an equivalent portion thereof.

1.11    **Infirmary**: refers to any medical unit within an ADC/DCC operated/managed facility that is licensed by the Arkansas Department of Health and used for the purpose of offering temporary medical care and/or treatment for inmates.

1.12    **Offender/Inmate**: refers to those individuals sentenced and received into ADC or DCC, individuals presently in the custody of ADC or DCC, **individuals housed** at facilities managed by the ADC as specified by terms of an **ADC management** contract, individuals admitted to community-based hospitals while in the custody of ADC/DCC, and individuals housed/managed under conditions of Act 309 Program with County Jails.  For purposes of this Agreement, this term **excludes**: individuals sentenced to ADC or DCC and who occupy a **City/County Jail** awaiting delivery to ADC or DCC, unless the jail is operated by ADC, individuals released from ADC or DCC custody to: parole, discharge, approved furlough, Interstate Compact, or, when removed from the custody of the ADC or DCC for court purposes.

1.13    **On-Call** or **After-Hours**:  refers to the procedure of scheduling a physician, dentist, psychiatrist, mid-level practitioner (PA/RNP), or clinical mental health staff so as to accommodate clinical direction in the care and/or treatment of a patient during those hours after completion of a normal workday or during weekends and holidays.

1.14    **PIPM**:  refers to Per Inmate Per Month rate for the purpose of quantifying the calculation upon which the monthly payments to CCS are based.

1.15    **Proposal**: refers to CCS's Technical Proposal dated June 14, 2013, submitted to ADC/DCC in response to RFP No. 2013-C8494.  The Proposal is fully incorporated into this Agreement by reference.

1.16    **Prostheses**: refers to artificial devices which replace missing body parts or compensate for defective bodily functions.  Examples include, but are not limited to: artificial limbs, eyeglasses, hearing aids, full and partial dentures.

1.17    **Qualified Health Care Personnel**:    refers to physicians, dentists, psychiatrists, psychologists, and other professional or paraprofessional or technical personnel who are licensed, registered, or certified in accordance with Arkansas law or regulation to engage in healthcare activities.  This includes the understanding that such individuals practice only within the scope and/or authorization of their license, registration, or certification.

1.18    **Rated Capacity**:   refers to the number of inmates for the purposes of reimbursement to CCS on the basis of per inmate per month.  Reimbursement is

guaranteed not to fall below 98% of the rated capacity for ADC and guaranteed not to fall below 95% of the rated capacity for DCC, as such are set and adjusted by the Board of Corrections.

1.19    **RFP:** refers to Request for Proposal No. 2013-C8494 issued on March 1, 2013 by Arkansas Department of Correction and Arkansas Department of Community Correction for Comprehensive Inmate/Offender Health Care Services. The RFP is fully incorporated into this Agreement by reference.

1.20    **Self-Care:** refers to that level of care or treatment of health condition which can be adequately handled or performed by patients themselves. This may include, but is not limited to: use of over-the-counter medications, application of special exercise(s), and/or institution of dietary restrictions.

1.21    **Treatment Plan:** refers to a series of written statements that specify a particular course of therapy and the roles of clinical and non-clinical personnel in carrying out the current course of therapy. It is individualized and based on assessment of the individual patient's needs, and includes a statement of the short and long term goals and the methods by which the goals will be pursued.

## ARTICLE II

### SCOPE OF SERVICES

The scope of services to be undertaken pursuant to this Agreement is set forth in the respective Section 9 of the RFP and Proposal and modified as follows:

A.    The scope of services as set forth in the RFP is modified only with regard to the specific language addressed and replaced with the following:

2.1    **Equipment**

**Section 9.22.5**

With the exception of CCS's proprietary Electronic Record Management Application (ERMA) and all its applications, all data, forms, procedures, software, manuals, system descriptions and workflows developed or accumulated specifically for use by ADC/DCC, used in the performance of this Agreement will become property of the State. This includes all materials completed manually, mechanically, or electronically for either internal or external use. CCS may not release any ADC/DCC materials without written approval of the agency.

B.    The scope of services as set forth in the Proposal is clarified to the extent that the following overarching affirmative statements are applied to all sections and supersede any deviations therefrom.

4

2.1     CCS will provide all services contemplated in this Agreement in accordance with the applicable ACA standard(s) for such services.

2.2     CCS will observe and adhere to all policies and procedures of the ADC and DCC for the delivery of healthcare services to inmates and in performance of all other non-clinical contractual obligations created by this Agreement.

C.     The scope of services will be performed by qualified healthcare personnel in accordance with CCS's Proposed Staffing Plan that was attached to their Proposal.

## ARTICLE III

## COMPENSATION

A.     As compensation for the healthcare services provided to inmates by CCS pursuant to this Agreement, ADC/DCC will reimburse CCS in accordance with Exhibits "A" to this Agreement.

## ARTICLE IV

## TERMS AND CONDITIONS

A.     The provisions of this Agreement supersede those of the RFP and Proposal, as those terms are defined herein.  The written documents governing the Parties' business relationship in order of hierarchy are as follows:  (i) this Agreement; (ii) the RFP as fully incorporated by reference; and (iii) the Proposal as fully incorporated by reference.

B.     This Agreement may be amended or modified only in writing and signed by all Parties.

C.     The initial term of this Agreement is eighteen (18) months, commencing at 12:01 a.m. on January 1, 2014 and continuing through 11:59 p.m. on June 30, 2015. Thereafter, the Agreement may be renewed by ADC/DCC on an annual basis for an additional eight (8) years beginning July 1 and ending on June 30 of subsequent years but in no event will extend beyond June 30, 2023.  Renewal by ADC/DCC must be made by written notification to CCS on or before March 31st before any annual extension of the Agreement.

D.     This Agreement is limited to comprehensive healthcare services and pharmacy services expressly excluding any expenses associated with hospital admissions of inmates which exceed twenty-four (24) hours.

E. ADC/DCC have the option to change the scope of the current Agreement from comprehensive healthcare services and pharmacy services expressly excluding any expenses associated with hospital admissions of inmates which exceed twenty-four (24) hours to an agreement whereby CCS assumes the full risk for healthcare and pharmacy expenses, including hospitalization costs, of inmates (the "Full Risk Option"). Such an election by ADC/DCC must be by written notification to CCS on or before March 31st before any renewal year of the Agreement for which the Full Risk Option is available, to commence on July 1st and continue until termination of this Agreement. The Full Risk Option at the rates in exhibit A is foreclosed unless notice is provided by March 31, 2018. Should ADC/DCC elect to exercise the Full Risk Option after the 2018-2019 fiscal year, the Parties will negotiate appropriate and mutually satisfactory compensation for CCS to assume full financial responsibility for healthcare services for inmates that would include inpatient admissions that exceed twenty-four (24) hours.

F. Should CCS terminate the Agreement without cause before June 30, 2023, ADC/DCC will withhold the sum of $5,000,000 (Five Million Dollars) from the last month's payment to CCS as an early termination penalty (the "Early Termination Penalty").

G. If the Parties fail to reach an agreement regarding changes in services or compensation causing an increase or decrease of one percent (1.0%) of the annual value of the Agreement within the 30-day period set forth for adjustment claims in Section 14.2 of the RFP, then either Party may terminate this Agreement upon ninety (90) days' prior written notice without penalty of any type or kind, including but not limited to, the Early Termination Penalty.

H. Any and all liquidated damages set forth in Section 14.25 of the RFP, Monetary Sanctions, which might have been assessed during the initial six (6) months of this Agreement are waived by ADC/DCC; however, CCS will provide the reports required by Section 14.25 during this initial six (6) months of this Agreement despite this waiver of damages and sanctions. Beginning July 1, 2014 and going forward for the duration of the Agreement, if liquidated damages are assessed, CCS reserves the right to review the audits conducted by ADC/DCC upon which such damages are based.

I. Any and all hourly deductions for staffing deficiencies set forth in Attachment #2 of the RFP, ADC/DCC Man-hour Deficiency Withholding Schedule, which might have been assessed during the initial three (3) months of the Agreement are waived by ADC/DCC. Further, no hourly deductions by position for deficiencies involving the additional staff of 6.1 FTEs proposed by CCS will be made during the initial six (6) months of the Agreement.

J. For staffing purposes and calculations of man-hour deficiencies, personnel overages per facility by position may be substituted for lower-level personnel

6

within that facility; for example, RN overages may be credited against LPN deficiencies or LPN overages may be used for Nursing Assistant deficiencies. For provider coverage, two hours of Mid-Level Practitioner time may be used to cover one hour of Physician time and vice versa. Note that personnel overages at facility A cannot be used to cover deficiencies at facility B.

K.  CCS will not be deemed in violation of this Agreement nor will any penalties, monetary sanctions, fines or fees be imposed if CCS is prevented from performing any of its obligations herein for reasons beyond its control such as natural disasters, inmate disturbances that exceed a twenty-four hour period at a facility that result in a facility lockdown or security action which prevents CCS from providing services. Note any action CCS seeks to invoke under this provision requires immediate notices to the Deputy Director of Health & Correctional Programs, the Administrator of Medical & Dental Services, or the Deputy Director for DCC as applicable.

## ARTICLE V

### MISCELLANEOUS

A.  Man-hour Deficiencies. Man-hour deficiency will be calculated per the RFP. An allowance of up to 96 non-productive hours, inclusive of paid time off, training and leave benefits, will be allowed per calendar year per facility per FTE position. The detailed staffing report from CCS is due by the twentieth (20th) working day of the month following the month of service.

B.  Telemedicine. CCS will be financially responsible for the ANGELS telemedicine program operated by UAMS at the Hawkins Facility for Women on the Wrightsville Complex.

C.  Clinical Decisions. Site physicians will have final authority for clinical decisions associated with their patients, including medications, off-site referrals, restrictions, etc.

D.  Mental Health Protocol. The ADC Mental Health Administrator is responsible for the development of ADC's Mental Health policy, procedure and guidelines.

E.  Medication Supply. CCS will comply with the pharmacy policies of the ADC and DCC acknowledging those policies allow for prescriptions up to 180 days and auto-refills.

F.  Hepatitis C Treatment. Treatment for inmates with Hepatitis C will be in accordance with recommendations of the American Association for the Study of

Liver Diseases, acknowledging that currently inmates within ADC are receiving three drug therapy as appropriate.

G.   Notice.   All notices or other communications required or permitted pursuant to this Agreement will be in writing and deemed to have been duly submitted to a Party if such communication is sent by U.S. first-class mail, registered or certified and postage prepaid, or by commercial courier such as Federal Express, to the named Party at the following address:

ADC
Arkansas Department of Correction
P.O. Box 8707
Pine Bluff, AR 71611
Attn: Director Ray Hobbs


DCC
Arkansas Department of Community Correction
Two Union National Plaza, 2nd Floor
105 West Capitol
Little Rock, AR 72201
Attn: Director Sheila Sharp


CCS
Correct Care Solutions, LLC
1283 Murfreesboro Road, Suite 500
Nashville, TN 37217
Attn: Jerry Boyle/Leilani Boulware


H.   Independent Contractor Status.   The Parties acknowledge that CCS is an independent contractor engaged to provide healthcare services to inmates at the ADC/DCC Operated/Managed Facilities under the direction of CCS management. Nothing in this Agreement is intended or will be construed to create an agency relationship, an employer-employee relationship, or a joint-venture relationship among the Parties.

I.   Medicaid Inmate Inpatient Reimbursement.   The Parties acknowledge and agree that CCS will not be deemed to be an insurance provider or other federally defined "payor" notwithstanding any provision set forth herein.

J.   Computer Equipment.   ADC/DCC will be responsible for maintaining their current EHR system, eOMIS, and related hardware and workstations per the RFP. CCS will be responsible for supplying and maintaining all computer equipment for use by its employees and agents outside of the clinical areas.

8

K.  ERMA Interfaces.  The Parties agree to work together in good faith and employ their respective best efforts to facilitate interface(s) between eOMIS (EHR) and CCS Systems or Vendors for care management (CM), pharmacy, lab and x-ray by January 1, 2014 or shortly thereafter as may be reasonably accomplished.

L.  Force Majure.  CCS will not be held responsible for delay or failure to perform hereunder when such delay or failure is due to any natural or man-made disasters or disturbances including but not limited to fire, flood, explosions, earthquakes, epidemic, strikes, riots, acts of God or public enemy, unusually severe weather, acts of civil or military authorities, or delay or defaults caused by public carriers which cannot be reasonably foreseen or accommodated.

M.  Severability.  In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceable provision will not affect the remainder of the Agreement which will remain in full force and effect.

N.  The Compensation Schedule exhibits "A" are part of this Agreement and fully incorporated by reference.

IN WITNESS WHEREOF, the Parties hereto, by their respective duly authorized representatives, have executed this Agreement on the date reflected hereunder.

State of Arkansas
DEPARTMENT OF CORRECTION

By: _____     Date: __9-25-13__
        Ray Hobbs, Director

State of Arkansas
DEPARTMENT OF COMMUNITY CORRECTION

By: _____     Date: __9-25-13__
        Sheila Sharp, Director

CORRECT CARE SOLUTIONS, LLC

By: _____     Date: __9/25/13__
        Gerard (Jerry) Boyle
Its: President and Chief Executive Officer

9

EXHIBIT A

Excluding Financial Responsibility for Inpatient Stays Exceeding Twenty-Four (24) Hours

| CONTRACT YEAR | Monthly ADC/DCC Cost PIPM | | Monthly ADC Act 309 Cost PIPM | | Total Monthly Cost PIPM | | Total Annual Cost |
|---|---|---|---|---|---|---|---|
| | Medical | Pharmacy | Medical | Pharmacy | Medical | Pharmacy | |
| *January 1, 2014 – June 30, 2015 | $ 270.18 | $ 53.26 | $ 20.61 | $ 53.26 | $ 265.52 | $ 53.26 | $ 92,101,699 |
| July 1, 2015 – June 30, 2016 | $ 278.81 | $ 55.00 | $ 21.27 | $ 55.00 | $ 274.00 | $ 55.00 | $ 63,368,425 |
| July 1, 2016 – June 30, 2017 | $ 286.88 | $ 56.62 | $ 21.89 | $ 56.62 | $ 281.93 | $ 56.62 | $ 65,208,644 |
| July 1, 2017 – June 30, 2018 | $ 294.33 | $ 58.12 | $ 22.46 | $ 58.12 | $ 289.25 | $ 58.12 | $ 66,906,677 |
| July 1, 2018 – June 30, 2019 | $ 301.98 | $ 59.54 | $ 22.99 | $ 59.54 | $ 296.17 | $ 59.54 | $ 68,515,113 |
| July 1, 2019 – June 30, 2020 | $ 309.62 | $ 61.24 | $ 23.62 | $ 61.24 | $ 304.27 | $ 61.24 | $ 70,402,020 |
| July 1, 2020 – June 30, 2021 | $ 316.60 | $ 62.62 | $ 24.16 | $ 62.62 | $ 311.13 | $ 62.62 | $ 71,988,881 |
| July 1, 2021 – June 30, 2022 | $ 323.80 | $ 63.97 | $ 24.70 | $ 63.97 | $ 318.21 | $ 63.97 | $ 73,610,757 |
| July 1, 2022 – June 30, 2023 | $ 331.25 | $ 65.22 | $ 25.27 | $ 65.22 | $ 325.54 | $ 65.22 | $ 75,263,319 |

(*First contract period is for eighteen (18) months)

ALTERNATE EXHIBIT A

FOR FULL RISK OPTION

| CONTRACT YEAR | Monthly ADC/DCC Cost PIPM | | | | Monthly ADC Act 309 Cost PIPM | | | | Total Monthly Cost PIPM | | | | Total Annual Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Medical | | Pharmacy | | Medical | | Pharmacy | | Medical | | Pharmacy | | |
| *January 1, 2014 – June 30, 2015 | $ | 306.21 | $ | 53.26 | $ 111.71 | $ | | 53.26 | $ | 302.57 | $ | 53.26 | $ | 102,806,930 |
| July 1, 2015 – June 30, 2016 | $ | 316.16 | $ | 55.00 | $ 115.34 | $ | | 55.00 | $ | 312.40 | $ | 55.00 | $ | 70,765,437 |
| July 1, 2016 – June 30, 2017 | $ | 325.48 | $ | 56.62 | $ 118.75 | $ | | 56.62 | $ | 321.62 | $ | 56.62 | $ | 72,853,017 |
| July 1, 2017 – June 30, 2018 | $ | 334.11 | $ | 58.12 | $ 121.89 | $ | | 58.12 | $ | 330.14 | $ | 58.12 | $ | 74,783,622 |
| July 1, 2018 – June 30, 2019 | $ | 342.29 | $ | 59.54 | $ 124.88 | $ | | 59.54 | $ | 338.23 | $ | 59.54 | $ | 76,615,821 |
| July 1, 2019 – June 30, 2020 | $ | 352.06 | $ | 61.24 | $ 128.44 | $ | | 61.24 | $ | 347.88 | $ | 61.24 | $ | 78,800,904 |
| July 1, 2020 – June 30, 2021 | $ | 359.99 | $ | 62.62 | $ 131.33 | $ | | 62.62 | $ | 355.71 | $ | 62.62 | $ | 80,575,501 |
| July 1, 2021 – June 30, 2022 | $ | 367.73 | $ | 63.97 | $ 134.16 | $ | | 63.97 | $ | 363.36 | $ | 63.97 | $ | 82,308,680 |
| July 1, 2022 – June 30, 2023 | $ | 374.91 | $ | 65.22 | $ 136.78 | $ | | 65.22 | $ | 370.46 | $ | 65.22 | $ | 83,916,058 |

(*First contract period is for eighteen (18) months)

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2022-Jun-29  15:33:34
35CV-18-660
C11WD01 : 8 Pages

## *UNIFORM COVER PAGE*

[To be used when required by Administrative Order No. 2 (g)*]

COURT:     ___CIVIL___ COURT OF __JEFFERSON_____ COUNTY

Docket/Case Number:  ____35CV-18-660_____

CASE NAME:
PLAINTIFF/
PETITIONER:              _____CHRISTINA MARZIALE et al_____

DEFENDANT/
RESPONDENT:         ___TENISHA BROWN et al_____

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):          _____EXHIBIT 2_____

*Administrative Order No 2.

   (g) *File Mark*. (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).

   (2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.



# Arkansas Department of Correction

## and

# Arkansas Department of Community Correction

## Request for Proposal

## NO. 2013 - C8494

# Comprehensive Inmate/Offender Health Care Services

March 1, 2013
Arkansas Department of Correction
Office of Health Services
6814 Princeton Pike
Pine Bluff, Arkansas 71602



EXHIBIT
2

# SECTION 5
## QUALIFICATIONS OF THE BIDDER(S)

The qualifications apply to bidders for both medical and pharmacy services unless specifically stated otherwise. Medical and mental health experience only applies to bidder(s) submitting a RFP for Medical Services. Bidder(s) should respond to each requirement below. To be considered for contract(s), the bidder(s) for Medical/Pharmacy Services must meet the following as required:

5.1   The bidder must demonstrate five (5) years of experience as a developed organization that provides correctional medical/pharmacy services, including staff with expertise in all requisite areas including clinical, pharmacy, support and records, fiscal and administrative, utilization management and quality assurance. The bidder and its staff must obtain and maintain any and all licenses and/or certifications necessary to do business in Arkansas.

5.2   The bidder must have the capital resources necessary to start up and maintain the program in the face of monthly variations in costs and expenses, major medical incidents, malpractice, indemnity, and the required performance bond.

5.3   The bidder must demonstrate in the response to this Request for Proposal that the bidder is a qualified healthcare provider with sustained experience in providing direct medical, mental health, and pharmacy services in correctional settings to large populations with diverse and significant health care needs. Bidder must have at least five (5) years of business/corporate experience within the last ten (10) years providing medical, mental health, and pharmacy services as defined in this Request for Proposal to a total daily population of at least 5,000 clients/offenders in a correctional setting. In the event the bidder has changed its company name, due to mergers,

expansions, etc., the bidder, with explanation, may include business/corporate experience under any previous name(s) to meet this requirement.

5.4     The bidder must provide proof of the ability to obtain general liability insurance, and professional liability insurance: bidder shall have general liability insurance with limits of not less than One Million Dollars ($1,000,000) each occurrence and Five Million Dollars ($5,000,000) in the aggregate annually, and bidder shall have professional liability insurance with limits of not less than One Million Dollars ($1,000,000) each occurrence and Five Million Dollars ($5,000,000) in the aggregate annually.  Bidder should demonstrate the ability to defend against Title 42 USC §1983 and malpractice lawsuits.  The bidder should also show legal insurance or guarantee in writing a commitment to defend employees sued for good-faith actions taken on behalf of the bidder for at least three (3) years following termination of the contract.

5.5     The bidder must demonstrate the commitment and ability to fully utilize ADC/DCC electronic health record system including medication administration and ordering, scheduling, etc.  Experience using an electronic health record is required.

5.6     The medical services bidder must show plans for providing secondary care in a manner that reduces the need for frequent off-site transport and consolidation of appointments to reduce demands for off-site security and transportation.  This should include health care technology, telemedicine and off-site clinical support.

5.7     The bidder must have the capability to implement service delivery as described herein on a date agreed upon between the bidder(s) and the Department. Bidder must provide, as part of the response to this Request for Proposal, a start-up and implementation plan, including a schedule with timelines that includes the initial delivery of equipment and supplies, the hiring and training of bidder staff, and the

transition of services. The goal for full service delivery at each Arkansas facility shall be no later than the contract start date.

5.8    The bidder must have demonstrated recruiting capabilities to fulfill the services bid and a track record in human resources management.

5.9    Bidders at the time of submission of the proposal shall provide a proposal security in the amount of Two Hundred Thousand Dollars ($200,000) for Medical Services, Fifty Thousand Dollars ($50,000) for Pharmacy Services, or Two Hundred Fifty Thousand Dollars ($250,000) for Medical Services and Pharmacy payable to the State of Arkansas. Seventy-five percent (75%) of the proposal security may be a cashier's check or standard letter of credit payable to the State of Arkansas; however, twenty-five percent (25%) must be written and issued in the form of a bond by a surety company licensed and authorized to do business in Arkansas. If a bidder is permitted by the Agency to withdraw a proposal, no action shall be taken against the bidder's proposal security. If the successful bidder withdraws, declines or fails to execute a contract within thirty (30) days of the contract being presented for signature the proposal security will be forfeited. All proposal securities, except any forfeited, will be returned upon receipt and acceptance of the Performance Security, or upon contract award. The proposal security must be made out to the State of Arkansas and should include the RFP number.

5.10   In order to assure full performance of all obligations imposed on a bidder(s) by contracting with the State, the Medical Services bidder will be required to provide and continue through the life of the contract a performance security in an amount of Four Million Dollars ($4,000,000) for the Medical Services Contract, One Million Dollars ($1,000,000) for the Pharmacy Services Contract or Five Million Dollars ($5,000,000) for the Combined Medical/Pharmacy Services within 30 working days from date of

registered lobbyist maintained by the contractor for the purpose of securing business. For breach or violation of this warranty, the State shall have the right to annul the contract without liability or in its discretion to deduct from the contract price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee.

**14.6** **Indemnification**

The contractor agrees to indemnify, defend and save harmless the State, its officers, agents and employees from:

**14.6.1** Any claims or losses resulting from services rendered by any subcontractor, person or firm, performing or supplying services, materials, or supplies to contractor and arising from the acts or omissions of contractor in connection with the performance of the contract.

**14.6.2** Any claims or losses to any person or firm injured or damaged by the erroneous or negligent acts, including without limitation, disregard of Federal or State Regulations or Statutes or ADC/DCC medical services policy, of the contractor, its officers, employees, or subcontractors in the performance of this contract.

**14.6.3** Any claims or losses resulting to any person or firm injured or damaged by the contractor, its officers, employees, or subcontractors by the publication, translation, reproduction, delivery, performance, use, or disposition of any data processed under the contract in a manner not authorized by the contract, or by Federal or State Regulations or Statutes.

**14.6.4** Any failure of the contractor, its officers, employees, or subcontractors to observe Arkansas laws, including but not limited to labor laws and minimum wage laws.

**14.13.3** The contractor is responsible for making sure that any subcontractor(s) are properly informed of the relevant terms and conditions of the contract, applicable state and federal laws and regulations, and ADC/DCC policy and procedure(s).

**14.13.4** The contractor shall give ADC/DCC immediate notice in writing by certified mail of any action or suit filed and prompt notice of any claim made against the contractor by any subcontractor or vendor which in the opinion of the contractor may result in litigation related in any way to the contract or the State of Arkansas.

**14.14** <u>Insurance Requirements/Performance **Bond**</u>

**14.14.1** The bidder(s) will provide general liability, professional liability, and Worker's Compensation Insurance, insuring the interests of all parties to the contract against any and all claims, which may arise out of bidder(s) operations under the terms of the Contract.  It is agreed that in the event any carrier of such insurance exercises cancellation, written notice will be made immediately to the ADC/DCC of such cancellation and the bidder's action to replace that insurance.

**14.14.2** The bidder(s) must provide proof of the ability to obtain general liability insurance, and professional liability insurance, bidder(s) must have general liability insurance with limits of not less than One Million Dollars ($1,000,000) each occurrence and Five Million Dollars ($5,000,000) in the aggregate annually, bidder(s) must have professional liability insurance with limits of not less than One Million Dollars ($1,000,000) each occurrence and Five Million Dollars ($5,000,000) in the aggregate annually.  <u>Documentation attesting to</u>

this requirement will be provided the ADC/DCC upon initiation of Contract and maintained current throughout the duration of the Contract.

**14.14.3** In order to assure full performance of all obligations imposed on a bidder(s) by contracting with the State, the Medical Services bidder will be required to provide and continue through the life of the contract a performance security in an amount of Four Million Dollars ($4,000,000) for the Medical Services Contract, One Million Dollars ($1,000,000) for the Pharmacy Services Contract or Five Million Dollars ($5,000,000) for the Combined Medical/Pharmacy Services within 30 working days from date of receipt of the State's written notification of its intent to award a contract. Twenty percent (20%) of performance security must be in the form of a surety bond; and the remaining amount may be a cashier's check or a standard letter of credit payable to the State of Arkansas. The surety bond must be in the form as is usually and customarily written and issued by surety companies and from a surety company licensed and authorized to do business in Arkansas. The performance security must be made out to the State of Arkansas and should include the RFP number and contract period.

**14.15** **Contract Renewal**

Contract performance will be evaluated during the third quarter of each year of contract. Contract terms or contract years run from July 1st of each year through June 30 of the following year after the initial eighteen (18) month period. Continuation of services required by Contract for the next one (1) year period will require approval of the Board of Corrections. The maximum term during which the ADC/DCC may contract with the contractor before issuing a new RFP is from the effective date of the contract, January 1, 2014, through June 30, 2023.

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2022-Jun-29  15:33:34
35CV-18-660
C11WD01 : 6 Pages

## *UNIFORM COVER PAGE*
[To be used when required by Administrative Order No. 2 (g)★]

COURT:     ___CIVIL___ COURT OF __JEFFERSON_____ COUNTY

Docket/Case Number:  ____35CV-18-660_____

CASE NAME:
PLAINTIFF/
PETITIONER:          _____CHRISTINA MARZIALE et al_____

DEFENDANT/
RESPONDENT:          ___TENISHA BROWN et al_____

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):          _____EXHIBIT 3_____

*Administrative Order No 2.

   (g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).

   (2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.

# Arkansas Department of Correction and Arkansas Department of Community Correction

Proposal to Provide Comprehensive Inmate/Offender Health Care Services

RFP # 2013-C8494

## Technical Proposal

June 14, 2013



Arkansas Department of Correction

**Respectfully Submitted to:**
AR Department of Correction
Attention: Teresa Funderburg
2403 E. Harding
Pine Bluff, AR 71602



**Submitted by:**
Correct Care Solutions, LLC
1283 Murfreesboro Road
Suite 500
Nashville, TN 37217
800-592-2974 X5777

Tax ID# 32-0092573

Point of Contact:
Patrick Cummiskey
Executive Vice President
(615) 324-5777 (Office)
(615) 324-5731 (Fax)
Patrick@ccsks.com



EXHIBIT
3



Comprehensive Inmate/Offender Health Care Services
RFP No. 2013-C8494



appropriate healthcare setting. CCS will make referrals for off-site specialty services through the process outlined in **Section 9.5.4** of this proposal. The Regional Outpatient UM Nurse will review all consults in the EHR daily using the EHR's consultation module and will have five days from the time the OSR is generated to ensure completion of the entire review process with the status updated in the EHR. The UM nurse will approve all referrals based on appropriateness and necessity.

## 9.10 Emergency Services

CCS has read, understands, and will comply with **Section 9.10** of the RFP. In accordance with ACA standards 4-ALDF-1C-01, 4-ALDF-1C-05, 4-ALDF-1C-15, 4-ALDF-4C-08, and 4-ALDF-4D-09, CCS will maintain a plan to provide 24-hour emergency medical, dental, and Mental Health services.

These services will include:
- On-site emergency first aid and crisis intervention
- Emergency evacuation of the inmate from the facility
- Use of an emergency medical vehicle
- Use of one or more designated hospital emergency rooms or other appropriate health facilities
- Emergency on-call or physician, dentist, and Mental Health professional services are available 24 hours per day, when the emergency health facility is not located in a nearby community
- Security procedures ensure the immediate transfer of inmates, when appropriate

The CCS program for ADC/DCC includes medical personnel on-site 24/7 to manage urgent and emergent on-site issues and to reduce off-site trips of inmates/residents. Unless within the best judgment of nursing personnel there is a 911 emergency, the decision to transfer an inmate/resident to an inpatient facility is made only upon consultation with the Medical Director or his designee. The Medical Director, Nurse Practitioner, and Dentist are on call 24/7.

### *Emergency Transportation*
CCS will be responsible for and will coordinate all emergency ambulance services for inmates at ADC/DCC. CCS staff will follow ADC/DCC policy and procedure regarding emergency transportation for care that cannot be managed on-site.

### *Emergency Treatment of Visitors, Staff, Employees, and Contractors*
CCS will provide emergency treatment to stabilize any visitors, staff, employees, or subcontractors of the ADC/DCC who become ill or injured and require emergency care while on the premises of any ADC/DCC facility. Once CCS health care staff has stabilized the patient, they will refer the patient to a personal physician or local hospital. Hospital or physician services for non-inmates will not be the financial responsibility of CCS.



Comprehensive Inmate/Offender Health Care Services
RFP No. 2013-C8494



## 14 Terms and Conditions

### 14.1 Start Up and Transition Plan
CCS has read, understands, and will comply with **Section 14.1** of the RFP.

Having successfully transitioned statewide DOC health care systems in Kansas, Vermont, Delaware, and Maine, CCS is confident we can deliver a seamless transition for the ADC/DCC. To ensure this, CCS has developed a strategic Start Up and Transition Plan, an outline of which is included in **Section 5.7**.

### 14.2 State's Right to Change Contract
CCS has read, understands, and will comply with **Section 14.2** of the RFP. CCS recognizes the right of the ADC/DCC to make changes within the general scope of the contract. CCS also agrees that any increase or decrease of one percent or more in the annual cost of the contract will require a mutually satisfactory adjustment in the contract price, delivery schedule, or both. CCS will make any claims for adjustment within 30 days from the date of notification of changes.

### 14.3 Termination Rights
CCS has read, understands, and will comply with **Section 14.3**, including all subsections, of the RFP. CCS recognizes the right of the ADC/DCC to terminate the contract in accordance with any of the reasons listed in **Sections 14.3.1–14.3.7**.

### 14.4 Disputes after Award
CCS has read, understands, and will comply with **Section 14.4** of the RFP.

### 14.5 Soliciting Agents
CCS has read, understands, and will comply with **Section 14.5** of the RFP. CCS warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee.

### 14.6 Indemnification
CCS has read, understands, and will comply with **Section 14.6**, including all subsections, of the RFP. CCS agrees to indemnify, defend and save harmless the State of Arkansas, its officers, agents and employees from:

- Any claims or losses resulting from services rendered by any subcontractor, person or firm, performing or supplying services, materials, or supplies to contractor and arising from the acts or omissions of contractor in connection with the performance of the contract.



Comprehensive Inmate/Offender Health Care Services
RFP No. 2013-C8494



- Any claims or losses to any person or firm injured or damaged by the erroneous or negligent acts, including without limitation, disregard of Federal or State Regulations or Statutes or ADC/DCC medical services policy, of the contractor, its officers, employees, or subcontractors in the performance of this contract.

- Any claims or losses resulting to any person or firm injured or damaged by the contractor, its officers, employees, or subcontractors by the publication, translation, reproduction, delivery, performance, use, or disposition of any data processed under the contract in a manner not authorized by the contract, or by Federal or State Regulations or Statutes.

- Any failure of the contractor, its officers, employees, or subcontractors to observe Arkansas laws, including but not limited to labor laws and minimum wage laws.

## 14.7  Lawsuits
CCS has read, understands, and will comply with **Section 14.7** of the RFP.

## 14.8  Notice of Legal Action
CCS has read, understands, and will comply with **Section 14.8** of the RFP.

## 14.9  Status of the Contractor
CCS has read, understands, and will comply with **Section 14.9** of the RFP.

## 14.10    Cooperation among Contractors
CCS has read, understands, and will comply with **Section 14.10** of the RFP. CCS has a long history of cooperation with other contractors in jails and prisons throughout the country. CCS agrees to fully cooperate with any other contractor the ADC/DCC contracts with for additional or related services. CCS also agrees to include Section 14.10 of the RFP as a paragraph in the contracts of all subcontractors.

## 14.11    Access to Records
CCS has read, understands, and will comply with **Section 14.11** of the RFP.

## 14.12    Assignment of Contract
CCS has read, understands, and will comply with **Section 14.12** of the RFP.

## 14.13    Subcontracts
CCS has read, understands, and will comply with **Section 14.13** of the RFP.



Comprehensive Inmate/Offender Health Care Services
RFP No. 2013-C8494



### 14.14    Insurance Requirements/Performance Bond
CCS has read, understands, and will comply with **Section 14.14**, including all subsections, of the RFP.

CCS meets the insurance requirements listed in this RFP section. For more detailed information about CCS insurance, please see **Section 5.4** of this proposal. CCS has included a certificate of insurance in **Tabbed Attachment F**.

For more information regarding our ability to provide performance security, please see **Section 1.25** of this proposal.

## 14.15    Contract Renewal
CCS has read, understands, and will comply with **Section 14.15** of the RFP.

## 14.16    Furnishing of Forms
CCS has read, understands, and will comply with **Section 14.16** of the RFP.

## 14.17    Reports and Project Control

### 14.17.1   Monitoring and Enforcing Adherence of the Contract Work Requirements
CCS has read, understands, and will comply with Section **14.17.1** of the RFP. CCS recognizes the authority of the ADC Administrator of Medical and Dental Services and the Staff Attorney for DCC to monitor and enforce adherence to the work requirements of the Contract.

### 14.17.2   Project Manager
CCS has read, understands, and will comply with **Section 14.17.2** of the RFP. The Statewide Regional Vice President (RVP) will be the designated Project Manager for this contract. With the assistance of the three (3) Regional Directors, the Regional Medical Director, Regional Dental Director, Regional Psychiatric Director, and the Regional Director of Nursing, the RVP will maintain supervision on a daily basis of all project activities and personnel involved with the project. The RVP and other Regional Directors will be located in the Regional Office (Pine Bluff vicinity) and will be available directly or by notice as may be required for handling unexpected project problems.

### 14.17.3   Monthly Reports
CCS has read, understands, and will comply with **Section 14.17.3** of the RFP. Demonstrating accountability through transparent reporting is a CCS core competency. In all medical operations, but especially in the corrections environment, it is essential to keep detailed accurate records that are readily available and easily accessed by medical and designated command staff.

Accountability for the success of the ADC/DCC Health Care Services Program is our responsibility. To continually review the effectiveness of our program and to improve overall

ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2022-Jun-29  15:33:34
35CV-18-660
C11WD01 : 61 Pages

*UNIFORM COVER PAGE*

[To be used when required by Administrative Order No. 2 (g)★]

COURT:        ___CIVIL___ COURT OF __JEFFERSON_____ COUNTY

Docket/Case Number:  ____35CV-18-660_____

CASE NAME:
PLAINTIFF/
PETITIONER:              _____CHRISTINA MARZIALE et al_____

DEFENDANT/
RESPONDENT:          ___TENISHA BROWN et al_____

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):              _____EXHIBIT 4_____

★Administrative Order No 2.

(g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).

(2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.



**EVANSTON INSURANCE COMPANY**

Policy No.  SM904110
Prev. No.   NEW
Prod. No.   MH200

**DECLARATIONS**    SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED OPERATIONS LIABILITY) - OCCURRENCE COVERAGE

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY CLAIMS MADE COVERAGE

There are both occurrence coverages and claims made coverages in this policy.

**Occurrence Coverage:** The General Liability Coverage afforded by this policy is limited to liability for Occurrences or offenses which take place during the Policy Period.

**Claims Made Coverage:** The Professional Liability Coverage afforded by this policy is limited to liability for only those Claims that are first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

**Notice:** This is a duty to defend policy. Additionally, this policy contains provisions that reduce the limits of liability stated in the policy by the costs of legal defense and permit legal defense costs to be applied against the deductible, unless the policy is amended by endorsement. Please read the policy carefully.

1.    **NAMED INSURED:** CCS INTERMEDIATE HOLDINGS, LLC

2.    **BUSINESS ADDRESS:**
            1283 MURFREESBORO ROAD SUITE 500
            NASHVILLE, TN  37217

3.    **POLICY PERIOD:** From November 15, 2014 to November 15, 2015
            12:01 A.M. Standard Time at address of Insured stated above

4.    A.  **SPECIFIED PRODUCTS, GOODS, OPERATIONS AND PREMISES COVERED:**

        Correctional Healthcare; all related premises and operations of the Insured

      B.  **PROFESSIONAL SERVICES:**

        Correctional Healthcare Services performed by an Insured in the treatment or care of any patient including: medical, dental, nursing, psychiatric, osteopathic, chiropractic or other professional care or service; furnishing or dispensing of medications, pharmaceuticals, blood and blood products, medical or surgical supplies, equipment or appliances; furnishing of food or beverages in connection with medical treatment or care; and the handling of post-mortem examinations on human bodies;

5.    **LIMITS OF LIABILITY:**

      A.  For General Liability:

        1.  For Coverage A. (Bodily Injury and Property Damage Liability):

            (i)   Each Occurrence:                                    See Endorsement #20

            (ii)  Damage to Premises  Any One Premises:              See Endorsement #20

        2.  For Coverage B. (Personal Injury and Advertising Injury Liability):

            Each Person or Organization:                            See Endorsement #20

        3.  For Coverage C. (Medical Payments):

            (i)   Each Injured Person:                              See Endorsement #20



EXHIBIT
4

**Policy No.** SM904110

    4.   Aggregate   All Coverages:                      See Endorsement #20

  B.  For Professional Liability:
       Each Claim:                                 See Endorsement #20
       Aggregate:                         See Endorsement #20

6.   **DEDUCTIBLE:**

  A.  For General Liability:

    1.  For Coverage A (Bodily Injury and Property Damage Liability):
       Each Occurrence:                        $   500,000

    2.  For Coverage B (Personal Injury and Advertising Injury Liability):
       Each Person or Organization:            $   500,000

  B.  For Professional Liability:
       Each Claim:                                  $   500,000

7.   **RETROACTIVE DATE:**

For Professional Liability:  November 15, 2013

8.   **RATE:**   **FLAT**

    **PREMIUM BASE:**   **FLAT**

9.   **PREMIUM FOR POLICY PERIOD:**

Minimum                                  $  ▮▮▮▮
Deposit                                    $  ▮▮▮▮

10.   **PREMIUM FOR EXTENDED REPORTING PERIOD:**

For Professional Liability:  150% for 12 months; 175% for 24 months; or 200% for 36 months

11.   The Insured is not a proprietor, superintendent, executive officer, director, partner, trustee or employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, or any business enterprise not named in Item 1. hereinabove, except as follows:

    None

**Policy No.** SM904110

12.    **ENDORSEMENTS ATTACHED AT POLICY INCEPTION:**

| | | |
|---|---|---|
| 1. | EIC 4115-01 | 25% Minimum Earned Premium Endorsement |
| 2. | EIC 832-01 | Asbestos Exclusion |
| 3. | ZZ-44002-01 | Mold Exclusion |
| 4. | MEIL 5229 09 10 | Longer Duration Extended Reporting Period Availability |
| 5. | EIC 4638-02 | Certified Acts of Terrorism Endorsement |
| 6. | MEIL 1323 09 13 | Conditional Exclusion of Terrorism |
| 7. | MPIL 1069 09 13 | Notice to Policyholders Potential Restriction of Terrorism Coverage |
| 8. | MEIL 5410 02 12 | Amendment of Definitions and Exclusions - Electronic Data and Distribution of Material in Violation of Statutes |
| 9. | MEIL 1313 02 12 | Amendment of Definitions and Exclusions - Electronic Data and Distribution of Material in Violation of Statutes |
| 10. | Manuscript | Non-Stacking Limitation When Two Or More Policies Apply |
| 11. | MESM 2030 05 14 | Amendatory Endorsement - Civil Rights Violation |
| 12. | Manuscript | Amendatory Endorsement - Civil Rights Violation General Liability |
| 13. | Manuscript | Sexual Acts Liability Endorsement |
| 14. | MESM 2087 05 12 | Defense of License Reimbursement Coverage |
| 15. | Manuscript | Supplementary Payments Endorsement - Trial Attendance |
| 16. | EIC 4652 | Employee Benefits Liability Coverage - Coverage D. |
| 17. | Manuscript | Self Insured Retention Endorsement |
| 18. | EIC 4645 | Claim Expenses in Addition to Per Claim Limit |
| 19. | EIC 4819 | Claim Expenses in Addition to the Each Claim Limit of Liability |
| 20. | Manuscript | Limits of Liability Per Location |
| 21. | IL 12 01 11 85 | Policy Changes (Additonal Named Insured) |
| 22. | Manuscript | Additional Insured Endorsement - Professional Liability |
| 23. | Manuscript | Additional Insured Endorsement - General Liability |
| 24. | Manuscript | Additional Insured Endorsement - Professional Liability |
| 25. | Manuscript | Additional Insured Endorsement - General Liability |
| 26. | EIC 4660 | Additional Insured Endorsement for Landlords, Sponsors or Lessors |
| 27. | MESM 2083 01 11 | Health Insurance Portability and Accountability Act (HIPAA) - Civil Monetary Penalty Endorsement |
| 28. | EIC 4601 | Amendment of Cancellation |
| 29. | Manuscript | Amendment of the Insured B |
| 30. | Manuscript | Amendment of the Insured G |
| 31. | MESM 2098 04 14 | Good Samaritan Endorsement |
| 32. | Manuscript | Notice of Claim Endorsement |
| 33. | Manuscript | Utilization, Quality Assurance, Accreditation, Committee and Peer Review Activities |
| 34. | MESM 2093 01 14 | Crisis Management Emergency Response Expense Reimbursement Coverage |
| 35. | MESM 2055 01 14 | Risk Management Services Expense Reimbursement |
| 36. | Manuscript | Aggregate Policy Limit |
| 37. | Manuscript | Amendment of Definitions    Punitive Damages |
| 38. | EIC4758 | Changes in Conrol of Named Insured |
| 39. | MEIL 1235 04 14 | Wisconsin Restriction Endorsement |
| 40. | Manuscript | Patient Compensation Fund Restriction Endorsement |
| 41. | Manscript | Addition of Contracts Endorsement |
| 42. | Manuscript | Cross Liability Self Insured Retention Endorsement |
| 43. | EIC 4660 04/07 | Additional Insured Endorsement For Landlords, Sponsors or Lessors |
| 44. | EIC 4745 04/08 | Amendment of Exclusion H. |

 

INTERLINE
POLICY NUMBER: SM904110

## EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## LIMITS OF LIABILITY PER LOCATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
    OPERATIONS) COVERAGE PART    OCCURRENCE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERERAGE PART    CLAIMS
    MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1.    Item 5.A of the Declarations, Limits of Liability, is deleted and replaced by the following:

    5.  **LIMITS OF LIABILITY:**

        A.  For General Liability    Each Location:

            1. For Coverage A. (Bodily Injury and Property Damage Liability):

| | |
|---|---|
| (i)  Each Occurrence: | $1,000,000 |
| (ii)  Damage to Premises    Any One Premises: | $300,000 |

            2. For Coverage B. (Personal Injury and Advertising Injury Liability):

| | |
|---|---|
| Each Person or Organization: | $1,000,000 |

            3. For Coverage C. (Medical Payments):

| | |
|---|---|
| (i)  Each Injured Person: | $10,000 |

            4. Aggregate:

| | |
|---|---|
| (i)  Each Location: | $3,000,000 |
| (ii)  All Coverages, All Locations: | $15,000,000 |

        B.  For Professional Liability:

| | |
|---|---|
| Each Claim: | $1,000,000 |
| Aggregate, Each Location: | $3,000,000 |
| Aggregate, All Locations: | $15,000,000 |

All other provisions of the policy shall remain unchanged.

INTERLINE
POLICY NUMBER: SM904110

2. The Specified Medical Professions General Liability Insurance Coverage Part is amended as follows:

Section Limits of Liability is amended by the addition of the following:

**Limit of Liability- Aggregate- All Coverages, All Locations:** Notwithstanding the Limits of Liability applicable to this Coverage Part and any other purchased Coverage Part(s), the total liability of the Company under this policy shall not exceed the Limit of Liability - Aggregate, All Locations as stated in Item 5.B.. of the Declarations.

2. The Specified Medical Professions Professional Liability Coverage Part is amended as follows:

Section Limits of Liability is amended by the addition of the following:

**Limit of Liability- Aggregate- All Coverages, All Locations:** Notwithstanding the Limits of Liability applicable to this Coverage Part and any other purchased Coverage Part(s), the total liability of the Company under this policy shall not exceed the Limit of Liability - Aggregate All Coverages, All Locations as stated in Item 5.A.4.ii. of the Declarations.

All other provisions of the policy shall remain unchanged.

## Specified Medical Professions Professional Liability Coverage Part Claims Made Coverage

THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE ONLY. PLEASE READ IT CAREFULLY.

### THE INSURED

The unqualified word Insured , either in the singular or plural, means:

A.  the Named Insured specified in Item 1. of the Declarations;

B.  any principal, partner, officer, director, Employee, Volunteer Worker or any former principal, partner, officer, director, Employee, or Volunteer Worker of the Named Insured, solely while acting on behalf of the Named Insured and within the scope of his/her duties as such; provided, however, this insurance shall not apply to any Claim made against any Insured who is a physician, surgeon or dentist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon or dentist;

C.  if the Named Insured specified in Item 1. of the Declarations is a limited liability company, any manager thereof or any past member thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as manager of the limited liability company and any member thereof or any past member thereof, but only with respect to the conduct of the business of the limited liability company;

D.  any medical director solely while acting on behalf of the Named Insured and solely within the scope of his/her Administrative Duties as such; provided, however, this insurance shall not apply to any Claim made against any medical director who is a physician, surgeon or dentist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon or dentist;

E.  any student enrolled in a training program in connection with the Named Insured s Professional Services solely while acting within the scope of his/her duties as such and at the Named Insured s direction;

F.  the heirs, executors, administrators, assigns and legal representatives of each Insured in the event of death, incapacity or bankruptcy of such Insured, but only while acting within the scope of their duties as such on behalf of the Named Insured or of the Insured's estate.

### INSURING AGREEMENT

The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 6.B. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to the Section A., Claim Reporting Provision, for Professional Personal Injury to which this Coverage Part applies by reason of any act, error or omission in Professional Services rendered or that should have been rendered by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, and arising out of the conduct of the Insured's Professional Services provided:

A.  the act, error or omission happens during the Policy Period or on or after the Retroactive Date stated in Item 7. of the Declarations; and

B.  prior to the effective date of this policy the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may result in a Claim under this Coverage Part.

### DEFINITIONS

A.  **Administrative Duties** means establishing medical protocol, serving on a standards review, peer review, or credentialing committee or similar professional board or committee of the Named Insured; provided, however, Administrative Duties shall not include:

    1.   rendering or failure to render to a patient, person or resident of a healthcare facility Professional Services by a medical director which results in Professional Personal Injury; or

    2.   rendering or failure to render patient specific medical direction via telecommunications to other healthcare professionals.

B.   **Claim** means a demand received by the Insured for monetary damages or services and shall include the service of suit or institution of arbitration proceedings against the Insured.

C.   **Claim Expenses** means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any Claim for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, that Claim Expenses shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

D.   **Professional Personal Injury** means:

    1.   any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any patient, person, or resident of a healthcare facility receiving Professional Services;

    2.   false arrest, detention or imprisonment, or malicious prosecution except when inflicted by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification; or

    3.   the publication or utterance of a libel or slander or a publication or an utterance in violation of a patient s right to professional confidence, except when published or uttered by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification.

## THE EXCLUSIONS

This Coverage Part does not apply to:

A.   any Claim based upon or arising out of any dishonest, fraudulent, criminal, malicious or knowingly wrongful acts, errors or omissions intentionally committed by or at the direction of the Insured;

B.   liability arising out of the Insured's activities in his/her capacity as proprietor, superintendent, executive officer, director, partner, trustee or Employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, business enterprise, or any governmental body, sub-division or agency not named as an Insured under this policy unless such activities are disclosed in the application and listed in Item 11. of the Declarations;

C.   any Claim based upon or arising out of any obligation of the Insured under any workers' compensation, unemployment compensation or disability benefits law or under any similar law;

D.   Professional Personal Injury to, or sickness, disease or death of any Employee of the Insured arising out of, and in the course of his/her employment by the Insured;

E.   any Claim based upon or arising out of any liability assumed by the Insured in a contract or agreement; provided, however, this exclusion shall not apply to liability an Insured would have in the absence of the contract or agreement;

F.   any Claim based upon or arising out of any unlawful discrimination by any Insured;

G.   injury arising out of the performance of a criminal act or caused by a person while under the influence of intoxicants or narcotics;

H. liability arising out of the ownership, maintenance, operation, use, loading or unloading of any vehicle, watercraft or aircraft;

I. any Claim based upon or arising out of any sexual act, including without limitation sexual intimacy (even if consensual), sexual contact, sexual advances, requests for sexual favors, sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual exploitation or other verbal or physical conduct of a sexual nature; provided, however, the Company shall defend the Named Insured for such a Claim for the strictly vicarious liability of the Named Insured, unless a manager, supervisor, officer, director, trustee or partner of the Named Insured:

   1. knew or should have known about the sexual act allegedly committed by the Insured but failed to prevent or stop it; or

   2. knew or should have known that the Insured who allegedly committed the sexual act had a prior history of such sexual misconduct act;

   The Company shall not pay Damages on behalf of the Named Insured for such a Claim.

J. any Claim arising out of general liability or products liability;

K. any Claim made against the Insured:

   1. by any person or organization or its subrogee, assignee, contractor, subcontractor, or parent company, subsidiary, division or affiliated company which was or is operated, managed, owned or otherwise controlled, whether directly or indirectly, or in whole or in part, by an Insured or parent company or any subsidiary, division or affiliated organization; or

   2. by or on behalf of any Insured under this policy; provided, however, this exclusion shall not apply to any Claim made against any Insured arising out of the rendering of or failure to render Professional Services by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, if such Insured is a patient or client of the Insured;

L. any Claim based upon or arising out of any employment dispute;

M. any Claim based upon or arising out of a warranty or guarantee of cure or success of treatment which is alleged to have arisen out of advertisement;

N. any Claim based upon or arising out of the dispensing of or the use of any drug or device whose approval for use was withdrawn by the Food and Drug Administration (FDA) at the time such drug or device was used or dispensed;

O. any Claim based upon or arising out of any actual or alleged violations of the Employee Retirement Income Security Act of 1974 (ERISA) and its amendments or any regulation or order issued pursuant thereto or any similar federal, state or local law;

P. any Claim based upon or arising out of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C., Section 1961, et seq.;

Q. any Claim based upon or arising out of any allegations of price fixing, unfair competition or trade practices; a dispute over fees, income or revenue; the inducement to enter into, the interference with or the dissolution or termination of any business or economic relationship, or violations of any federal, state or local law (including but not limited to Title 15 of the United States Code or any similar state statute) that prohibits the unlawful restraint of trade, business or profession;

R. any administrative or judicial hearings pertaining to Medicare/Medicaid fraud or any other hearing initiated against an Insured by the United States Department of Health & Human Services (HHS) or by an utilization or quality review organization under contract with HHS; provided, however, this exclusion shall not apply to HHS proceedings that allege the violation of the Emergency Medical Treatment and Labor Act; or

S. any Claim brought under any other Coverage Part of this policy.

## LIMITS OF LIABILITY

A.  **Limit of Liability-Each Claim:**  The total liability of the Company for the combined total of Damages and Claim Expenses for each Claim first made during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated in Item 5.B. of the Declarations as applicable to Each Claim.

B.  **Limit of Liability - Aggregate:**  Subject to the above Limits of Liability A., the total liability of the Company shall not exceed the Aggregate Limit of Liability as stated in Item 5.B. of the Declarations for all Damages and Claim Expenses arising out of all Claims first made during the Policy Period and the Extended Reporting Period, if exercised.

C.  **Limit of Liability - Reduction for Refusal to Settle:**  The Company shall not settle any Claim without the consent of the Insured. If, however, the Insured is a partnership, professional association, professional corporation or limited liability company, the written consent of an Insured who was formerly but is no longer a member of the partnership, professional association or limited liability company or director, officer, stockholder or Employee of a professional corporation will not be required, provided the written consent of the corporate directors, officers, stockholders or Employees of a professional corporation, or their duly appointed representatives, has been obtained. If, however, the Insured shall refuse to consent to any settlement recommended by the Company and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company's liability for the Claim shall not exceed the amount for which the Claim could have been so settled including Claim Expenses incurred up to the date of such refusal. Such amounts are subject to the provisions of the above Limits of Liability A. and B.

D.  **Deductible:**  The Deductible amount stated in Item 6.B. of the Declarations shall be paid by the Named Insured and shall be applicable to each Claim and shall include Damages and Claim Expenses, whether or not Damages payments are made.

Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each Claim shall not exceed the Deductible amount stated in Item 6.B. of the Declarations. Solely for the purpose of determining the Company's limit of liability, the Deductible amount shall be deemed to be applied first to the Damages.

The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

E.  **Multiple Insureds, Claims and Claimants:**  The inclusion herein of more than one Insured in any Claim or suit or the making of Claims or the bringing of suits by more than one person or organization shall not operate to increase the Limits of Liability stated in Item 5.B. of the Declarations. More than one Claim arising out of a single act, error or omission or a series of related acts, errors or omissions shall be considered a single Claim. All such Claims, whenever made, shall be treated as a single Claim. Such single Claim, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such act, error or omission is made or with regard to notice given to and accepted by the Company pursuant to Section Claims B., Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

## DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

The Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies. Subject to Section Limits of Liability C., the Company may make such investigation and settlement of any Claim as it deems expedient. Claim Expenses incurred in defending and investigating a Claim shall be a part of and shall not be in addition to the applicable Limits of Liability stated in Item 5.B. of the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any Damages or to defend or to continue to defend any Claim or to pay Claim Expenses for Claims after the applicable Limit or Limits of Liability stated in Item 5.B. of the Declarations have been exhausted.

## CLAIMS

A.  **Claim Reporting Provision:** The Insured shall give to the Company written notice as stated in Item 13. of the Declarations as soon as practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

In the event suit is brought against the Insured, the Insured shall immediately forward to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

B.  **Discovery Clause:** If during the Policy Period, the Insured first becomes aware of a specific act, error or omission in Professional Services which may result in a Claim within the scope of the coverage for this Coverage Part, then the Insured may provide written notice as stated in Item 13. of the Declarations to the Company containing the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such act, error or omission in Professional Services shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

1.  the description of the specific act, error or omission;

2.  the date on which such act, error or omission took place;

3.  the injury or damage which has or may result from such act, error or omission;

4.  the identity of any injured persons; and

5.  the circumstances by which the Insured first became aware of such act, error or omission.

## EXTENDED REPORTING PERIOD

A.  If the Named Insured nonrenews this policy or cancels this policy pursuant to Common Policy Conditions, Section Other Conditions A., or if the Company nonrenews this policy or cancels this policy pursuant to Common Policy Conditions, Section Other Conditions A., Cancellation, for reasons other than nonpayment of premium or Deductible or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right upon payment of an additional premium calculated at the percentage stated in Item 10. of the Declarations of the annual deposit premium for the policy, subject to adjustment as per Common Policy Conditions, Section Other Conditions G. Premium and Audit, but in no event less than the percentage set forth in Item 10. of the Declarations of the annual minimum premium for the policy to extend the coverage granted under this Coverage Part, to Claims first made against the Insured during the period of months stated in Item 10. of the Declarations; as elected by the Named Insured, and reported to the Company pursuant to, Section Claims A., Claim Reporting Provision, following immediately upon the effective date of such cancellation or nonrenewal, for any act, error or omission in Professional Services rendered on or after the Retroactive Date and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this policy. This period of months as elected by the Named Insured and described in this paragraph shall be referred to in this policy as the Extended Reporting Period.

If, however, this policy is immediately succeeded by similar claims made insurance coverage on which the Retroactive Date is the same as or earlier than that stated in the Item 7. of the Declarations, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Insured shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium and/or Deductible and/or Limit of Liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

This Extended Reporting Period shall not be available when any Insured's license or right to practice his/her profession is revoked, suspended or surrendered.

B.   As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid: (1) all Deductibles when due; (2) all premiums due for the Policy Period; and (3) all premium due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement must have been paid.

The right to purchase the Extended Reporting Period shall terminate unless a written notice as stated in Item 13. of the Declarations of such election for the Extended Reporting Period is received by the Company within thirty (30) days after the effective date of cancellation or nonrenewal together with payment of the additional deposit premium for the Extended Reporting Period. If such written notice of election and payment of additional premium are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

C.   The Named Insured shall pay any additional premium that may be due as a result of audit, promptly when due.

D.   In the event of the purchase of the Extended Reporting Period the entire premium therefrom shall be fully earned at its commencement.

E.   The Extended Reporting Period shall not in any way increase the Limits of Liability stated in Item 5B. of the Declarations.

## OTHER INSURANCE

This insurance shall be in excess of the Deductible stated in Item 6.B. of the Declarations and any other valid and collectible insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this Coverage Part.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES

Policy Change
Number 45

| POLICY NUMBER<br>SM904110 | POLICY CHANGES<br>EFFECTIVE<br>January 1, 2015 | COMPANY<br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>CCS INTERMEDIATE HOLDINGS, LLC | | AUTHORIZED REPRESENTATIVE<br>AMWINS ACCESS<br>2851 CHARLEVOIX DRIVE, SE<br>Suite 220<br>Grand Rapids, MI 49546 |

COVERAGE PARTS AFFECTED
DECLARATIONS

CHANGES

**ADDITONAL NAMED INSURED**

In consideration of the additional premium of $1,727,292, it is understood and agreed that the Named Insured shown in Item #1 of the Declarations is amended to include the following:

| Additional Named Insured | Retroactive Date |
|---|---|
| Correctional Healthcare Companies fka CHC Companies, LTD | January 1, 2015 |
| Correctional Healthcare Companies | January 1, 2015 |
| Judicial Correction Services, Inc. | January 1, 2015 |
| Jessamine Healthcare Holdings, LLC | January 1, 2015 |
| Jessamine Healthcare. Inc | January 1, 2015 |
| Correctional Healthcare Holding Company, Inc. fka Jessamine-Peyton Purchaser, Inc. | January 1, 2015 |
| Correctional Healthcare Holdings, Inc. | January 1, 2015 |
| Correctional Healthcare Management, Inc. | January 1, 2015 |
| Health Professionals, Ltd | January 1, 2015 |
| Correctional Healthcare Management of Oklahoma, Inc. | January 1, 2015 |
| Correctional Staffing Solutions, Inc. | January 1, 2015 |
| CHC Pharmacy Services, Inc | January 1, 2015 |
| Correctional Healthcare Physicians, P.C. | January 1, 2015 |
| Correctional Healthcare Physicians II, P.C. | January 1, 2015 |
| Correctional Healthcare Physicians III, P.C. | January 1, 2015 |

POLICY NUMBER: SM904110

| | |
|---|---|
| Justice Services Holding, LLC | January 1, 2015 |
| Hase and Associates System, Inc. | January 1, 2015 |
| Physicians Network Association, Inc. | January 1, 2015 |
| PNA of New Mexico, Inc. | January 1, 2015 |
| PNA of Arizona, Inc. | January 1, 2015 |
| CAF Enterprises, Inc. | January 1, 2015 |
| CHC Healthcare Inc. | January 1, 2015 |
| Correctional Healthcare Dentists, P.C. | January 1, 2015 |
| Darlene L. Clark, DMD, P.C. dba Correctional Healthcare Dentists II, P.C. | January 1, 2015 |
| Correctional Healthcare Dentists III, P.C. | January 1, 2015 |
| Joseph E. Hancock, M.D. (A Professional Medical Corporation) | January 1, 2015 |
| Lawrence I. Wolk, M.D. (A Professional Medical Corporation) | January 1, 2015 |
| Health Professionals, LTD | January 1, 2015 |
| Advanced Counseling Center, LLC | January 1, 2015 |
| Secure Care, Inc. | January 1, 2015 |
| CHC Companies, Inc. fka Correctional Healthcare Companies, Inc | January 1, 2015 |
| Correctional Healthcare Consultants, Inc. | January 1, 2015 |
| Correctional Mental Health Professionals I, P.C. | January 1, 2015 |
| Raymond K. Herr, M.D., A Professional Medical Corporation d/b/a Correctional Healthcare Physicians IV, P.C. | January 1, 2015 |

_Authorized Representative_

All other terms and conditions remain unchanged.

 Copyright, Insurance Services Office, Inc., 1983
Copyright, ISO Commercial Risk Services, Inc., 1983

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES

Policy Change
Number 46

| POLICY NUMBER<br>SM904110 | POLICY CHANGES<br>EFFECTIVE<br>March 1, 2015 | COMPANY<br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>CCS INTERMEDIATE HOLDINGS, LLC | | AUTHORIZED REPRESENTATIVE<br>AMWINS ACCESS INSURANCE SERVICES,<br>LLC<br>2851 CHARLEVOIX DRIVE, SE<br>Suite 220<br>Grand Rapids, MI 49546 |

COVERAGE PARTS AFFECTED
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE  PART
CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
OPERATIONS LIABILITY)   OCCURRENCE COVERAGE

## CHANGES

### ADDITION OF ENDORSEMENT

In consideration of the premium paid, it is hereby understood and agreed that SELF-INSURED RETENTION ENDORSEMENT, is being added as attached effective as of the date stated above.

_Authorized Representative_

All other terms and conditions remain unchanged.

**IL 12 01 11 85**    Copyright, Insurance Services Office, Inc., 1983    Page 1 of 1
Copyright, ISO Commercial Risk Services, Inc., 1983



INTERLINE
POLICY NUMBER: SM904110



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

## SELF-INSURED RETENTION ENDORSEMENT

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
  COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
  OPERATIONS LIABILITY) COVERAGE PART    OCCURRENCE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended but only with respects to the Valuscia County Contract as follows:

1.  Item 6. of the Declarations is deleted and replaced as follows:

    6.                **SELF-INSURED RETENTION:**

        A.            For General Liability:

                1.       For Coverage A (Bodily Injury and Property Damage Liability):

                        Each Occurrence:                $25,000

                2.       For Coverage B (Personal Injury and Advertising Injury Liability):

                        Each Person or Organization:      $25,000

        B.            For Professional Liability:

                      Each Claim:                     $25,000

2.  Whenever used in the Specified Medical Professions Professional Liability Insurance Coverage Part and the Specified Medical Professions General Liability Insurance Coverage Part, the word Deductible  is deleted and replaced with  Self-Insured Retention .

3.  Specified Medical Professions Professional Liability Insurance Conversation Part, Section Limits of Liability D., Deductible, is deleted and replaced with the following:

    **D.  Self-Insured Retention:**  The Self-Insured Retention amount stated in the Declarations shall be paid by the Named Insured and shall be applicable to each Claim and shall include Damages and Claim Expenses, whether or not Damages payments are made.

    Such amounts shall, upon written demand by the Company, be paid by the Named Insured, CCS Intermediate Holdings, LLC (the  Named Insured ) within ten (10) days. The total payments requested from the Named Insured in respect of each Claim shall not exceed the Self-Insured Retention amount stated in the Declarations.

INTERLINE
POLICY NUMBER: SM904110

The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Insured.

At its sole discretion, the Company reserves the right to independently audit the Insured s claim files and records for any Claim that is within the Self-Insured Retention.

Subject to Section Limits of Liability, the Company shall be liable for only such Damages and Claim Expenses, which are in excess of the Self-Insured Retention. The payment of the Self-Insured Retention is a condition precedent to the Insured s right to the protection afforded by this policy. Bankruptcy or insolvency of the Insured or of the Insured's estate or the Insured s inability to pay shall not relieve the Insured of its obligations hereunder.

4.  Specified Medical Professions Professional Liability Insurance Coverage Part, Section Defense, Settlements and Claim Expenses is deleted and replaced with the following:

**Defense, Investigation and Settlement of Claims:**  It shall be the duty of the Named Insured, CCS Intermediate Holdings, LLC, its own expense to defend, investigate and settle any Claim against any Insured seeking Damages to which this insurance applies which is within the Self-Insured Retention.

Notwithstanding the above, the Company shall have the option, but not the duty to associate with the Named Insured in the defense, investigation and settlement of any Claim arising out of a Malpractice, Professional Healthcare Services or Professional Personal Injury to which this Coverage Part applies which in the Company s opinion is likely to exceed the Self-Insured Retention. With respect to such Claim, which is subject in whole or in part to the Self-Insured Retention, the Company may at its option pay part of or all of the Self-Insured Retention including Damages and Claim Expenses on behalf of and for the account of the Insured to effect settlement of such Claim. Such amounts so paid by the Company shall be immediately reimbursed by the Named Insured. The determination by the Company as to the reasonableness of such Damages and Claims Expenses shall be conclusive on the Insured.

Upon exhaustion and payment of the Self-Insured Retention, the Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies pursuant to the following provisions:

1.  Claim Expenses incurred in defending and investigating such Claim shall be in addition to the applicable Limits of Liability stated in the Declarations. Such Claim Expenses shall not reduce the Limits of Liability and shall be applied against the Self-Insured Retention. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the applicable Limits of Liability stated in the Declarations have been exhausted by payment(s) of Damages.

2.  The Company shall select defense counsel; provided, however, that if the law of the state of the Insured s domicile, stated in Item 2. of the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

a. providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

b. providing any other reasonable information requested;

c. providing fully itemized billing on a periodic basis; and

d. cooperating with the Company and the Insured in resolving any and the fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as stated above, shall be included in Claim Expenses. Such Claim Expenses shall be in addition to the applicable Limits of Liability stated in the Declarations. Such Claim Expenses shall not reduce the Limits of Liability and shall be applied against the Self-Insured Retention.

Upon exhaustion of the Self-Insured Retention, the Named Insured will transfer all Claim related files and take all reasonable steps to transfer defense of such Claim to the Company.

5. Specified Medical Professions Professional Liability Insurance Coverage Part, Section Claims A., Claim Reporting Provision, is deleted and replaced with the following:

A. **Claim Reporting Provision:** It is a condition precedent to coverage afforded by this Coverage Part that the Named Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable of any Claim:

1. in excess of the Self-Insured Retention first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised;

2. which the Insured s estimated amount of Damages and/or Claim Expense is or can reasonably be expected to be fifty percent (50%) or more of the amount of the Self-Insured Retention; or

3. which involves:

   a. Death;

   b. Brain or spinal injury;

   c. Amputation;

   d. Loss of use of arm, leg, sight or hearing;

   e. Severe burns;

   f. Serious loss of use of any bodily function

   g. Paralysis;

   h. Reflex Sympathy Dystrophy;

   j. Complex Regional Pain Syndrome;

   k. Multiple factures, multiple areas;

   l. Sexual molestation; or

   m. Potential class action

In the event suit is brought against the Insured, the Named Insured shall immediately forward to Markel Service, Incorporated, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

The Named Insured shall provide to Company a quarterly bordereaux of Claims, losses or incidents that might reasonably be expected to give rise to a Claim or loss within the Self-Insured Retention. Quarterly bordereaux reports containing the Claimant s name, the date of loss and information on the nature of the injury or allegations shall constitute Notice of Claim.

6. Specified Medical Professions General Liability Insurance Coverage Part, Section Limits of Liability F., Deductible, is deleted and replaced with the following:

**F. Self-Insured Retention:** The Self-Insured Retention amount stated in the Declarations shall be paid by the Named Insured and shall be applicable to each Occurrence and to each person or organization and shall include Damages and Claim Expenses, whether or not Damages payments are made.

Such amounts shall, upon written demand by the Company, be paid by Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each Claim shall not exceed the Self-Insured Retention amount stated in the Declarations.

The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Insured.

At its sole discretion, the Company reserves the right to independently audit the Insured s claim files and records for any Claim that is within the Self-Insured Retention.

Subject to Section Limits of Liability, the Company shall be liable for only such Damages and Claim Expenses, which are in excess of the Self-Insured Retention. The payment of the Self-Insured Retention is a condition precedent to the Insured s right to the protection afforded by this policy. Bankruptcy or insolvency of the Insured or of the Insured's estate or the Insured s inability to pay shall not relieve the Insured of its obligations hereunder.

7. Specified Medical Professions General Liability Insurance Coverage Part, Section Defense, Settlements and Claim Expenses is deleted and replaced with the following:

**A. Defense, Investigation and Settlement of Claims:** It shall be the duty of the Named Insured, CCS Intermediate Holdings, LLC, at its own expense to defend, investigate and settle any Claim against an Insured seeking Damages to which this insurance applies which is within the Self-Insured Retention.

Notwithstanding the above, the Company shall have the option, but not the duty to associate with the Named Insured in the defense, investigation and settlement of any Claim arising out of a Malpractice, Professional Healthcare Services or Professional Personal Injury to which this Coverage Part applies which in the Company s opinion is likely to exceed the Self-Insured Retention. With respect to such Claim, which is subject in whole or in part to the Self-Insured Retention, the Company may at its option pay part of or all of the Self-Insured Retention including Damages and Claim Expenses on behalf of and for the account of the Insured to effect settlement of such Claim. Such amounts so paid by the Company shall be immediately reimbursed by the Named Insured. The determination by the Company as to the reasonableness of such Damages and Claims Expenses shall be conclusive on the Insured.

Upon exhaustion and payment of the Self-Insured Retention, the Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies pursuant to the following provisions:

1. Claim Expenses incurred in defending and investigating such Claim shall be in addition to the applicable Limits of Liability stated in the Declarations. Such Claim Expenses shall not reduce the Limits of Liability and shall be applied against the Self-Insured Retention. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the applicable Limits of Liability stated in the Declarations have been exhausted by payment(s) of Damages.

2. The Company shall select defense counsel; provided, however, that if the law of the state of the Insured s domicile, stated in Item 2. of the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the

INTERLINE
POLICY NUMBER: SM904110

Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

**a.** providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

**b.** providing any other reasonable information requested;

**c.** providing fully itemized billing on a periodic basis; and

**d.** cooperating with the Company and the Insured in resolving any discrepancies;

and the fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as stated above, shall be included in Claim Expenses. Such Claim Expenses shall be in addition to the applicable Limits of Liability stated in the Declarations. Such Claim Expenses shall not reduce the Limits of Liability and shall be applied against the Self-Insured Retention.

Upon exhaustion of the Self-Insured Retention the Named Insured will transfer all Claim related files and take all reasonable steps to transfer defense of such Claim to the Company.

**8.** Specified Medical Professions General Liability Insurance Coverage Part, Section Claims A., Claim Reporting Provision, is deleted and replaced with the following:

**A.** **Claim Reporting Provision:** It is a condition precedent to coverage afforded by this Coverage Part that the Named Insured shall give the Company written notice as stated in the Notices item of the Declarations as soon as practicable of any Claim:

**1.** in excess of the Self-Insured Retention first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised;

**2.** which the Insured s estimated amount of Damages and/or Claim Expense is or can reasonably be expected to be fifty percent (50%) or more of the amount of the Self-Insured Retention; or

**3.** which involves:

**a.** Death;

**b.** Brain or spinal injury;

**c.** Amputation;

**d.** Loss of use of arm, leg, sight or hearing;

**e.** Severe burns;

**f.** Serious loss of use of any bodily function

**g.** Paralysis;

**h.** Reflex Sympathy Dystrophy;

**j.** Complex Regional Pain Syndrome;

**k.** Multiple factures, multiple areas;

**l.** Sexual molestation; or

**m.** Potential class action

In the event suit is brought against the Insured, the Named Insured shall immediately forward to Markel Service, Incorporated, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.



DECLARATIONS

EXCESS INSURANCE POLICY

**SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS OR LOSS DISCOVERED DURING THE POLICY PERIOD PROVIDED THAT SUCH CLAIM OR LOSS IS REPORTED IN WRITING TO THE UNDERWRITERS PURSUANT TO THE POLICY PROVISIONS. AMOUNTS INCURRED AS DEFENSE COSTS SHALL REDUCE AND MAY EXHAUST THE APPLICABLE LIMITS OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THE UNDERWRITERS SHALL NOT BE LIABLE FOR ANY DEFENSE COSTS OR FOR ANY JUDGMENT OR SETTLEMENT AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED. PLEASE READ THIS POLICY CAREFULLY.**

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

| | |
|---|---|
| **Underwriters:** | Syndicates 2623/623 at Lloyd's |
| **Policy Number:** | W1467E140201 |
| **Authority Ref. Number:** | B6012BUSANMSL1401 |

NO FLAT CANCELLATION

Item 1. **Named Insured:**

CCS Intermediate Holdings, LLC

Principal Address:

1283 Murfreesboro Road, Suite 500
Nashville, TN 37217

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as a surplus line coverage pursuant to the Tennessee insurance statutes.
Surplus Lines Broker:
Name: _____Kendra S Schaendorf_____
Address: PO Box 111, Grand Rapids, MI 49501-0111_____

Item 2. **Policy Period:**

From:    15 November 2014
To:        15 November 2015

(Both dates at 12:01 a.m. Local Time at the Principal Address stated in Item 1.)

Item 3. **Limits of Liability:**
$10,000,000    Each Claim
$10,000,000    Aggregate for the **Policy Period**, including costs and expenses incurred in the defense or settlement of all claims.

Item 4. **Premium:**        $

Tennessee Premium: _____
Fees: _____
Surplus Lines Tax: _____

Item 5. **Notification under this Policy:**

a. Notification pursuant to Clause VI shall be given to:

Beazley USA Services, Inc.
30 Batterson Park Road
Farmington, CT 06032
Tel: (860) 677-3700
Fax: (860) 679-0247

b. All other notices under this Policy shall be given to:

Beazley USA Services, Inc.
30 Batterson Park Road
Farmington, CT 06032
Tel: (860) 677-3700
Fax: (860) 679-0247

Item 6: **Service of process in any suit shall be made upon:**

Mendes & Mount, LLP
750 7th Ave #24
New York, NY 10019

Item 7: **Choice of Law:**      Tennessee

Item 8: **Endorsements Effective at Inception:**

1. NMA1256 Nuclear Incident Exclusion Clause-Liability-Direct (Broad) (U.S.A.)
2. NMA1477 Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A)
3. NMA 2918 War and Terrorism Exclusion Endorsement
4. E02093052010 Asbestos Exclusion
5. E01513102009 Lead Exclusion
6. E01911032010 Silica Exclusion Endorsement
7. BSLXS05010206 Mold Exclusion
8. BSLXS05040511 Retroactive Date Exclusion
9. E00118102007 Retroactive Limitation Clause
10. E01910032010 Premium Payment Warranty Endorsement
11. E01912032010 Bilateral Extended Reporting Period Endorsement
12. E01913032010 Minimum Earned Premium Endorsement
13. E02278082010 Deceptive Trade Practices Exclusion
14. E02505022011 Amend Notice of Claim
15. E02943052011 Additional Named Insured Endorsement
16. E03159092011 Single Limit of Liability Endorsement
17. E03796062012 Reliance on Another Insurance Company's Application
18. E07752112015 Retroactive Dates(s) for Scheduled Contract(s)
19. E07753112015 Claims Audit Endorsement
20. ECI012112015 Notice of Claim Endorsement
21. ECS016112015 Additional Exclusions
22. EJM001102014 Umbrella Coverage Exclusion
23. LMA5092 U.S. Terrorism Risk Insurance Act of 2002 as Amended Not Purchased Clause
24. Schedule2014 Lloyd's Security Schedule

Dated: 19 November 2015

At:   30 Batterson Park Road
Farmington, Connecticut 06032
(the office of the Correspondent)

By: _____
Beazley USA Services, Inc. (Correspondent)

SCHEDULE OF UNDERLYING INSURANCE

EXCESS INSURANCE POLICY

Type of Insurance: PL/GL/Auto/EL

Primary Policies:

Professional Liability/ General Liability/ Auto Liability/ Employers Liability

| Primary Policies | | | | | |
|---|---|---|---|---|---|
| Primary Insurer: | Limits of Liability: | Retention: | Term: | Retro: |
| Landmark American Insurance Company (RSUI) (CCS Tail) Policy # LHC742208 | $1,000,000 per Claim/$3,000,000 per Location Aggregate - Professional Liability $1,000,000 per Claim/$3,000,000 per Location Aggregate - General Liability $1,000,000 per Claim/$3,000,000 Aggregate – Employee Benefits Liability $1,000,000 Products/Comp Operation Aggregate $1,000,000 Personal Injury and Advertising Limit $10,000 Medical Payments (Any One Person) $300,000 Fire Damage (Any One Fire) $10,000,000 Combined Policy Aggregate (claims expenses in addition to limits) | $50,000 | 15 November 2013 – 15 November 2018 (ERP) | 01 October 2003 |
| Evanston Insurance Company (CHC Tail) Policy #MM824178 | $1,000,000 per Claim each Physician/$5,000,000 Aggregate - Professional Liability $1,000,000 per Claim Entity/$10,000,000 Aggregate/Organizational Liability $1,000,000 per Occurrence/$5,000,000 Aggregate- General Liability | $100,000 | 01 January 2015-2019 | 25 September 1995 |
| Evanston Insurance Company (CCS/CHC) Policy # SM904110 | $1,000,000 per Claim/$3,000,000 per Location Aggregate - Professional Liability $1,000,000 per Claim/$3,000,000 per Location Aggregate - General Liability $1,000,000 per Claim/$3,000,000 Aggregate – Employee Benefits Liability $1,000,000 Products/Comp Operation Aggregate $1,000,000 Personal Injury and Advertising Limit $10,000 Medical Payments (Any One Person) $300,000 Fire Damage (Any One Fire) $15,000,000 Combined Policy Aggregate (claims expenses in addition to limits) | $500,000 | CCS: 15 November 2014-2015  CHC: 01 January 2015-15 November 2015 | CCS: 15 November 2013  CHC: 01 January 2015 |
| Evanston Insurance | Professional Liability: Coverage A: | $50,000 | 15 November 2014-2015 | 15 November 2013 |

| | | | | |
|---|---|---|---|---|
| Company Policy # SM904115 | $500,000 / $1,500,000 in Pennsylvania $250,000/$750,000 in Indiana $100,000/$300,000 in Louisiana Coverage B: $1,000,000/$3,000,000 Coverage Aggregate: $10,000,000<br><br>General Liability: $1,000,000/$3,000,000 per location Coverage Aggregate: $15,000,000 | | | |
| KaMMCO Policy  # KSP0017112 | $200,000 –per Doctor/per Claim $400,000 Aggregate | Nil | 15 November 2014 – 01 October 2015 and any renewals thereof | 01 October 2013 |
| KHCSF Policy  # Varies by physician | $800,000 –per Doctor/per Claim $2,400,000 Aggregate | Nil | 15 November 2014 – 01 October 2015 and any renewals thereof | 01 October 2013 |
| American Zurich Insurance Company Policy # BAP5252136 | $1,000,000 – Auto Combined Single Limit (non-Enterprise fleet) | Nil | 15 November 2014-31 March 2015 | N/A |
| American Zurich Insurance Company 2 Policies Policy #s WC5252134 & WC525135 | $ 1,000,000 –  EL – Bodily Injury By Accident – Each Accident $ 1,000,000 – EL – Bodily Injury By Disease – Each Employee $ 1,000,000 – EL –  Bodily Injury By Disease – Policy Limit | $250,000 | 15 November 2014-01 October 2015 and any renewals thereof | N/A |
| Commerce and Industry 6 Policies Policy #s - 4321869. 4321846, 4321842, 4321844,517604 26 & 51760425 | $ 1,000,000 –  EL – Bodily Injury By Accident – Each Accident $ 1,000,000 – EL – Bodily Injury By Disease – Each Employee $ 1,000,000 – EL – Bodily Injury By Disease – Policy Limit | Guarantee Cost | 15 November 2014-01 October 2015 and any renewals thereof | |
| Granite State Insurance Company 5 Policies Policy #- 51760424, | $ 1,000,000 –  EL – Bodily Injury By Accident – Each Accident $ 1,000,000 – EL – Bodily Injury By Disease – Each Employee $ 1,000,000 – EL –  Bodily Injury By Disease – Policy Limit | Guarantee Cost | 15 November 2014-01 October 2015 and any renewals thereof | |

| | | | | |
|---|---|---|---|---|
| 51760423,51760 422, 51760420 & 51760421<br><br>Texas Mutual Policy # TSF-0001274260 | $ 1,000,000 -- EL -- Bodily Injury By Accident -- Each Accident<br>$ 1,000,000 -- EL -- Bodily Injury By Disease -- Each Employee<br>$ 1,000,000 -- EL -- Bodily Injury By Disease -- Policy Limit | Guarantee Cost | 15 November 2014-01 August 2015 and any renewals thereof | |
| The Old Republic Insurance Company Policy # L364528-14 | $1,000,000 -- Auto Combined Single (Enterprise Fleet) | Nil | 15 November 2014 - 31 March 2015 | N/A |
| Farmers Insurance Policy # 19605493926 (League Medical Concepts) | $1,000,000 -- Auto Combined Single | Nil | 15 November 2014 - 31 March 2015 | N/A |

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**

## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

    (a)      with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b)      resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

    (a)      the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

    (b)      the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.   As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)   any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)   any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)   any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

\* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**

RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**

<u>WAR AND TERRORISM EXCLUSION ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.  war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.  any act of terrorism.

    For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the coverage under this Insurance does not apply to damages and claims expenses incurred with respect to:

1.      any claim arising directly out of, or resulting from or in consequence of, or in any way involving:

      a.      asbestos or any materials containing asbestos in whatever form or quantity;

      b.      the actual, potential, alleged or threatened presence, release or dispersal of any asbestos; or

      c.      any action taken by any party in response to the actual, potential or threatened presence, release or dispersal of any asbestos particles of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such materials containing asbestos.

2.      any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened presence, release or dispersal of any asbestos containing particles of any kind.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## LEAD EXCLUSION

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the Underwriters shall not be liable for loss or damages incurred with respect to any claims based upon, arising from, or in any way attributable to any product, substance or waste which contains lead.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E01513
102009 ed.

Page 1 of 1

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## SILICA EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.    The coverage under this Policy does not apply to loss or costs and expenses incurred with respect to bodily injury and/or property damage arising out of silica, including but not limited to:

   A.    inhaling, ingesting or physical exposure to silica directly or through any goods, products, structures, real estate or land containing silica;

   B.    the use or presence of silica in any process or operation of any type, including but not limited to construction, manufacturing, sandblasting, cleaning, drilling, farming or mining;

   C.    the use or presence of silica in any goods, products, structures, real estate or land, or any component part of any good, product, structures, real estate or land containing silica;

   D.    the manufacture, sale, transportation, handling, storage, or disposal of silica or any goods, products, structures, real estate or land containing silica;

   E.    disease actually or allegedly caused by, contributed to or aggravated by silica, including but not limited to silicosis, chronic silicosis, accelerated silicosis, acute silicosis, conglomerate silicosis, any auto-immune disorder, tuberculosis, silicoproteinosis; cancer, scleroderma, emphysema, pneumoconiosis, pulmonary fibrosis, progressive massive fibrosis, any lung disease or any other ailment actually or allegedly caused by, contributed to or aggravated by silica;

   F.    any costs of medical or other testing, monitoring or diagnosis arising from or related to any actual, alleged, threatened or feared disease or injury, including any emotional or mental distress, arising in whole or in part, directly or indirectly, out of silica; or

   G.    any cost of investigations, feasibility studies, cleaning, removal or remediation of the actual or alleged presence of silica in or on any goods, products, structures, real estate or land.

2.    For the purposes of this Exclusion, "silica" means any silica in the form of and any of its derivatives, including but not limited to silica dust, silicon dioxide (SiO2), crystalline silica, quartz, or non-crystalline (amorphous silica).

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E01911                                                                           Page 1 of 1
032010 ed.

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**MOLD EXCLUSION**</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the coverage under this insurance does not apply to any claim either in whole or in part, directly or indirectly arising out of, or resulting from or in consequence of, or in any way involving:

1.      the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

2.      any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; or

3.      any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

provided, that this exclusion does not apply to legal liability that arises out of a negligent act, error or omission in the performance of the **Insured's** professional services.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

BSLXS05010206                                                                 Page 1 of 1

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>RETROACTIVE DATE EXCLUSION</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that this policy shall not apply to loss or damages in connection with or resulting from any claim or circumstance that might lead to a claim arising out of any act, error or omission which took place, or is alleged to have taken place, prior to per below:

01 October 2003 unless otherwise indicated - CCS

31 December 2012 – Geo Care, LLC / Correct Care, LLC

25 September 1995 – PL – CHC (First $5,000,000)

31 March 2013 – GL – CHC (First $5,000,000)

01 January 2015 – CHC ($5,000,000 excess $5,000,000 excess Primary); except where otherwise scheduled per contract.

01 August 2013 – League Medical

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

### PREMIUM PAYMENT WARRANTY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

All premium due to the Underwriters under this Policy is paid within 30 days from the inception date of the Policy. Non-receipt of such premium by midnight (local standard time) on the premium due date, shall render this Policy void from the inception date.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E01910                                                                                   Page 1 of 1
032010 ed.

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**BILATERAL EXTENDED REPORTING PERIOD ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that the Policy is amended by the addition of the following:

**XII.　EXTENDED REPORTING PERIOD**

A.　Notwithstanding anything contained in any 'extended reporting period', 'optional extended reporting period' or 'automatic extended reporting period' (or any other similar provision) of the **Primary Policy**, in the event of cancellation or non-renewal of this insurance by the **Named Insured** designated in Item 1. of the Declarations, or by the Underwriters, the **Named Insured** shall have the right, upon payment in full and not proportionally or otherwise in part of the relevant percentage of the Premium set forth below, for claims first made against any **Insured** and reported in writing to the Underwriters, during the Extended Reporting Period, to have issued an endorsement providing one of the following options:

| Premium for Optional Extension Period: | Length of Optional Extension Period: |
|---|---|
| 175% of the total premium for the policy | 12 Months |
| 200% of the total premium for the policy | 24 Months |
| 225% of the total premium for the policy | 36 Months |

arising out of any act, error or omission (or arising out of conduct covered in the **Primary Policy**) committed on or after the Retroactive Date and before the end of the **Policy Period**, and otherwise covered by this Insurance.

B.　In order for the **Named Insured** to invoke the Extended Reporting Period option, the Named Insured must:

1. pay the additional premium for the Extended Reporting Period to the Underwriters within thirty (30) days of the non-renewal or cancellation of this Policy;

2. purchase an Extended Reporting Period under all **Underlying Policies:**

   (i)　for a period of no less than 12 months from the cancellation or non-renewal date of this Policy; and

   (ii)　with no reduction of the **Underlying Policy Limits** except for any reduction solely by payment of any claims or costs and expenses incurred in the defense or settlement of such claims.

E01912
032010 ed.

Page 1 of 2

C.   The Limit of Liability for the Extended Reporting Period shall be part of, and not in addition to, the Underwriters' Limit of Liability for the **Policy Period**

D.   The quotation by the Underwriters of a different premium or Deductible or Limit of Liability or changes in Policy language for the purpose of renewal shall not constitute a refusal to renew by the Underwriters.

E.   The right to the Extended Reporting Period shall not be available to the **Named Insured** where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an **Insured** to pay such amounts in excess of the applicable Limit of Liability or within the applicable Deductible or Retention.

F.   All notices and premium payments with respect to the Extended Reporting Period shall be directed to the Underwriters through the entity named in Item 5.b. of the Declarations.

G.   At the commencement of the Extended Reporting Period, the entire premium shall be deemed earned, and in the event the **Named Insured** terminates the Extended Reporting Period for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the Extended Reporting Period.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E01912
032010 ed.

Page 2 of 2

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or**
**the "Underwriters"**

<u>MINIMUM EARNED PREMIUM ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

If the **Named Insured** cancels this Insurance prior to reporting any claim or circumstance under this Policy, 30% of the premium shall be deemed earned upon inception of the Policy, and the remaining earned premium shall be computed in accordance with the customary short rate table and procedure. If the **Named Insured** has reported a claim or circumstance under this Policy the premium will be deemed to be fully earned.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E01913
032010 ed.

Page 1 of 1

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>DECEPTIVE TRADE PRACTICES EXCLUSION</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the coverage under this Policy does not apply to claims or losses or costs and expenses incurred with respect to any claim based upon or arising out of any actual or alleged unfair or deceptive trade practice or violation of any statute, ordinance or regulation pertaining to restraint of trade, unfair competition, antitrust, price fixing or consumer protection. To the extent a claim alleges both professional negligence and any of the above excluded enumerated offenses, Underwriters and the **Insured** will use their best efforts to reach a fair allocation between covered and uncovered loss.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

E02278
082010 ed.

Page 1 of 1

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>AMEND NOTICE OF CLAIM</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause **VI.   NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM** is deleted in its entirety and replaced with the following:

> All claims first made during the **Policy Period** and circumstances that might lead to a claim reported under the **Primary Policy** must be reported to the Underwriters in writing via the entity named in Item 5. of the Declarations before the end of the **Policy Period** or any additional claims reporting period granted by the **Primary Policy** provided such additional claims reporting period is no greater than thirty (30) days.  However, the **Insured** must provide immediate written notice to the Underwriters via the entity named in Item 5 of the Declarations of any claim made against the **Insured** where the **Insured** or the **Insured's** defense counsel evaluates the potential liability of all claims plus costs and expenses incurred in the defense or settlement of such claims at an amount equal to or greater than fifty percent (50%) of the **Underlying Policy Limits**.  Notice to any underlying carrier is not notice to the Underwriters.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E02505
022011 ed.

Page 1 of 1

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>ADDITIONAL NAMED INSURED ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.      Item 1. of the Declarations is amended to include the following:

        Item 1.  Named Insured:

                To match underlying policies


2.      Solely with respect to the Additional Named Insured(s) identified in paragraph **1.** above the
        following Retroactive Date(s) shall apply:

                To match underlying policies




All other terms and conditions of this Policy remain unchanged.




_____

Authorized Representative



E02943                                                                                  Page 1 of 1
052011 ed.

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**SINGLE LIMIT OF LIABILITY ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that with respect to the Commercial Excess Liability Coverage, there will be one combined single limit of liability as set forth in Item 3. of the Declarations.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E03159
092011 ed.

Page 1 of 1

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or**
**the "Underwriters"**

<u>RELIANCE ON ANOTHER INSURANCE COMPANY'S APPLICATION</u>

This endorsement modifies insurance provided under the Policy referenced above.

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that
the Insurer has relied upon the statements in the following application(s):

RSUI Group, Inc.
RSSG 50026 0209

including materials attached thereto, completed by the entity designated in Item 1. of the
Declarations and such application is made a part of this insurance Policy and operates as the
Insurer's own application.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

E03796                                                                Page 1 of 1
062012 ed.

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>RETROACTIVE DATE(S) FOR SCHEDULED CONTRACT(S)</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

With respect to each contract scheduled below this policy shall not apply to loss or damages in connection with or resulting from any claim or circumstance that might lead to a claim arising out of any act, error or omission which took place, or is alleged to have taken place, prior to the applicable retroactive date schedule below:

| **Contract** | | **Retroactive Date** |
|---|---|---|
| Arizona State Prison – Florence West / GEO | 915 East Diversion Dam Road, Florence, AZ 85131 | 01 March 2006 |
| Arizona State Prison – Phoenix West / GEO | 3402 West Cocopah Street, Phoenix, AZ 85009 | 01 March 2006 |
| Reeves County Detention Center Unit R-3 / Reeves County Commissioners Court | 99 West County Road 204/PO Box 1560, Pecos, TX 79772 | 01 September 2006 |
| Central Arizona Correctional Facility / GEO | 1401 West Diversion Dam Road, Florence, AZ 85232 | 01 December 2006 |
| Reeves County Detention Center Units R-1/R-2 / Reeves County Commissioners Court | 99 West County Road 204/PO Box 1560, Pecos, TX 79772 | 01 March 2007 |
| North Texas Intermediate Sanction Facility / GEO | 4700 Blue Mound Road, Ft. Worth, TX 76106 | 01 September 2008 Termed 28 February 2011 |
| Frio County Detention Center / GEO | 410 South Cedar, Pearsall, TX 78061 | 04 November 2008 Term 02 December 2011 |
| Adelanto Ice Processing Center East & West / GEO | 10400 Rancho Road, Adelanto, CA 92301 | 01 August 2011 |
| Western Region Detention Facility at San Diego / GO | 220 C Street, San Diego, CA 92101 | 01 August 2011 |
| Golden State Medium Community Correctional Facility | 611 Frontage Road, McFarland, CA 93250 | 29 November 2012 |
| Big Spring Correctional Center / GEO | 1701 Apron Drive, Big Spring, TX 79720 | 01 January 2013 |
| Lawton Correctional Facility / GEO | 8607 Flower Mound Road, Lawton, OK 73501 | 01 October 2013 |

E07752
112015 ed.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>NOTICE OF CLAIM ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

EXCESS INSURANCE POLICY

In consideration of the premium charged for the Policy, it is hereby understood and agreed that with regards to coverage in excess of any Professional Liability and/or General Liability insurance provided in the **Underlying Policies**, Clause VI. **NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM** is amended by the addition of the following:

A claim or suit shall be considered to be first made against the **Insured** at the earlier of the following:

    A.  When notice of claim or suit is received by General Counsel or the Risk Management or Legal Department of the **Insured**; or

    B.  When General Counsel or the Risk Management or Legal Department of the **Insured** knew about or should reasonably have known a circumstance was likely to result in a claim or suit; or

    C.  When a claim or suit is reported in writing directly to the Underwriters.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

ECI012
112015 ed.

Page 1 of 1

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## UMBRELLA COVERAGE EXCLUSION

This endorsement modifies insurance provided under the following.


**EXCESS INSURANCE POLICY**


In consideration of the premium charged for the Policy, it is hereby understood and agreed that this Insurance does not apply to any umbrella coverage(s) for CCS New Jersey Medical Services Professional Corporation and its scheduled physicians, except for those coverages endorsed onto the primary RSUI policy and as shown in our Schedule of Underlying Policies.


All other terms and conditions of this Policy remain unchanged.


_____
Authorized Representative

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## ADDITIONAL EXCLUSIONS

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that this policy shall not apply to loss or damages in connection with or resulting from any claim or circumstance:

1. arising out of any circumstance or occurrence known to the **Insured** prior to the inception of this Policy and not disclosed to the Insurer at inception;

2. arising out of, directly or indirectly resulting from or in consequence of any activities by any prison guard(s) and/or security guard(s), other than those activities related to healthcare, provided however, this exclusion does not apply to Geo Care, LLC/ Correct Care, LLC;

3. arising out of stop loss or pharmacy benefit management activities;

4. occurring between 1 November 2013 and 15 November 2013, provided that this exclusion shall not apply to the Laundry List received by the Underwriters on 03 December 2013.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 15-Nov-2014**
**This Endorsement is attached to and forms a part of Policy Number: W1467E140201**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

**U.S. Terrorism Risk Insurance Act of 2002 as amended**
**Not Purchased Clause**

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

_____
Authorized Representative

**LLOYD'S SECURITY SCHEDULE**

Syndicate 2623     82%
Syndicate 623      18%


ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.

CERTIFICATE PROVISIONS

 Lloyd's Insurance

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

SLC-3 (USA) NMA2868 (24/08/00) Printed by the Corporation of Lloyd's.

1.  **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declaration Page.

2.  **Correspondent Not Underwriters.** The Correspondent is not an Underwriter hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Underwriters hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as hereinbefore set forth. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3.  **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4.  **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

5.  **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

6.  It is hereby understood and agreed that wherever the word 'Policy' appears herein it shall be deemed to read 'Certificate.'



## EXCESS INSURANCE POLICY

In consideration of the payment of the premium, in reliance on all statements made in the application, and subject to all of the provisions of this Policy, the Underwriters and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

**I.    INSURING CLAUSES**

To pay on behalf of the **Insured** excess of the **Underlying Policies** any claim or loss which triggers coverage under the **Underlying Policies**, and is not otherwise excluded by the terms, conditions or endorsements of this policy,  and which is reported to Underwriters in accordance with Clause VI. of this Policy.

**II.    DEFINITIONS**

The following terms whenever used in this Policy in boldface type **shall** have the meanings indicated.

A.      "**Insured**" shall mean all persons and entities insured under the **Primary Policy**.

B.      "**Named Insured**" shall mean the person or entity set forth in Item 1. of the Declarations.

C.      "**Policy Period**" shall mean the period set forth in Item 2. of the Declarations.

D.      "**Primary Policy**" shall mean each policy identified as such in the Schedule of Underlying Insurance.

E.      "**Sublimit**" means any **Underlying Limits** which:

1.      apply only to a particular grant of coverage under such **Underlying Policy**; and

2.      reduce and are part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in the Declarations.

F.      "**Underlying Policies**" shall mean all policies identified in the Schedule of Underlying Insurance.

G.      "**Underlying Limit**" means the limit of liability of an individual **Underlying Policy**.

H.      "**Underlying Policy Limits**" shall mean the combined limits of liability of the **Underlying Policies** for each type of insurance, including costs and expenses incurred in the defense or settlement of any claim.

BSLXS00020206                                                                                Page 1 of 4

III.   **LIMIT OF LIABILITY**

A.   The amount shown in Item 3. of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriters under this Policy.

B.   Payment by the Underwriters of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

IV.   **MAINTENANCE OF UNDERLYING POLICIES**

It is a condition of this Policy that the **Underlying Policies** shall be maintained in full effect during the **Policy Period** except for any reduction of the **Underlying Policy Limits** solely by payment of any claims or losses or costs and expenses incurred in the defense or settlement of such claims. If this condition is breached then this Policy shall automatically and immediately terminate with effect from the date when the **Underlying Policies** cease to be maintained or are deemed to have ceased to be maintained.

In the event the insurer under one or more of the **Underlying Policies** fails to pay any claim or loss or costs and expenses incurred in the defense or settlement of such claim as a result of the insolvency, bankruptcy or liquidation of said insurer, then the **Insured** shall be deemed self-insured for the amount of the limit of liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation.

V.   **REDUCTION / EXHAUSTION OF THE UNDERLYING POLICIES**

If by reason of the payment of any claims or losses or costs and expenses incurred in the defense or settlement of such claims or losses by the insurers of the **Underlying Policies**, the amounts of the **Underlying Policy Limits** are:

A.   Partially reduced, then this Policy shall continue to apply in excess of the reduced amounts of the **Underlying Policy Limits**; or

B.   Totally exhausted, then this Policy shall continue in force as primary insurance with respect to any subsequent claim; provided, however that this Policy shall only pay in excess of the retention or deductible applicable to the **Primary Policy** and in conformance with the terms, conditions and limitations of the **Primary Policy** except as stated herein, which shall be applied to any subsequent claim in the same manner as specified in the **Primary Policy**.

C.   If any **Underlying Limits** are subject to a **Sublimit** then coverage hereunder shall not apply to any claim which is subject to such **Sublimit**, provided however, that the **Underlying Limit** shall be recognized hereunder as depleted to the extent of any payment of such claim subject to such **Sublimit**.

VI.   **NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM**

For all claims and circumstances that might lead to a claim the **Insured** must provide written notice in the same manner as required by the **Primary Policy**, and must be reported to the Underwriters

in writing via the entity named in Item 5. of the Declarations.  Notice to any underlying carrier is not notice to the Underwriters.

**VII.    CONDITIONS**

A.    In the event of a claim or loss for which the Underwriters hereon may be liable to contribute, no costs or expenses shall be incurred on their behalf without their written consent being first obtained (such consent not to be unreasonably withheld).    No settlement of a claim or loss shall be effected by the **Insured** for such a sum as will involve this Policy without the written consent of the Underwriters hereon.

B.    All recoveries or payments recovered or received subsequent to a loss settlement under this Policy shall be applied first to subrogation expenses, second to claims or loss or costs and expenses incurred in the defense or settlement of such claims by the Underwriters hereon, third to claims or loss or costs and expenses incurred in the defense or settlement of such claims by the insurers of the **Underlying Policies**, and fourth to the applicable retention or deductible under the **Primary Policy**.  Provided always that nothing in this Policy shall be construed to mean that loss settlements under this Policy are not payable until the **Insured's** ultimate net loss has been finally ascertained.

C.    If the **Insured** shall proffer any claim or loss knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claims hereunder shall be forfeited.

D.    By acceptance of this Policy, the **Insured** agrees the Underwriters may at their own discretion and expense retain counsel to associate in the defense or settlement of any claim and to cooperate with such counsel.

E.    If during the **Policy Period** the provisions of the **Primary Policy** are changed in any manner, as a condition precedent to coverage under this Policy, the **Insured** shall give written notice to the Underwriters of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change.  No amendment to any **Primary Policy** or **Underlying Policies** during the **Policy Period** shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the Underwriters so agree in writing.  The Insurer may, in its sole discretion, condition its agreement to follow any changes to the **Primary Policy** or the **Underlying Policies** on the **Insured** paying any additional premium required by the Underwriters for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the **Insured** must give the Underwriters written notice of any additional or return premiums charged or allowed in connection with any **Underlying Policies.**

**VIII.    SINGULAR FORM OF A WORD**

Whenever the singular form of a word is used herein, the same shall include the plural when required by context.

IX.    TITLES OF PARAGRAPHS

The titles of paragraphs, sections, provisions or endorsements of or to this Policy are intended solely for convenience and reference. Such titles are not deemed in any way to limit, expand or define the provisions to which they relate and are not part of this Policy.

X.    SERVICE OF SUIT

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due under this Insurance, the Underwriters hereon, at the request of the **Insured**, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon the persons named in Item 6. of the Declarations, and that in any suit instituted against any one of them upon this contract, the Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The persons named in Item 6. of the Declarations is authorized and directed to accept service of process on behalf of the Underwriters in any such suit and/or upon the request of the **Insured** to give a written undertaking to the **Insured** that they will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this Policy, and hereby designate the persons named in Item 6. of the Declarations, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

XI.    CHOICE OF LAW

Any dispute concerning the interpretation of this Policy shall be governed by the laws of the state designated in Item 7. of the Declarations.

| RSUI Group, Inc.<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA 30326-1160 | APPLICATION FOR MISCELLANEOUS<br>MEDICAL LIABILITY INSURANCE<br>(CLAIMS-MADE FORM) |
|---|---|

**General Applicant Information**

1. Name of Applicant:  Correct Care Solutions (including GEO and CHC)

2. Principal Address:  1283 Murfreesboro Road

3. City:  Nashville          County:  Davidson          State:  TN          Zip Code:  37217

4. Phone:  1-800-592-2974                    Website Address:  www.correctcaresolutions.com

5. a. Does the Applicant practice as:    ☐ Corporation  ☐ Partnership  ☐ Individual  ☐ Prof. Association

   ☒ Other:  LLC

   b. In what states is the applicant registered and licensed to practice?    Australia and ALL states except:AL, AK, CT, DC,<br>   DE, HI, MS, MT, NH, ND, RI, SD, UT, WV and PR.

6. Date Applicant was established:    08  /  29  /  03
   ・・・・・・・・・・・・・・・・・・・・・・・・・・・・・・・MM・・・・DD・・・・YY

7. Is the firm engaged in, owned by, associated with or controlled by any other business?    Yes - GEO and CHC

   If yes, give details    acquired both companies in 2014.

8. PROFESSIONAL ACTIVITIES AND SPECIALTY (Attach narrative description if necessary)

   ☐  Health Maintenance Organization                    ☐  Residential Healthcare Facility

   ☐  Home Healthcare Agency                              ☒  Other (Specify)    Healthcare

   ☒  Medical/Testing Laboratory

   ☐  Nurse's Registry

   ☐  Out-Patient Clinic

9. State approximate division of applicant's patients among:

   | a. Alcoholics | (_____)% | h. Holistic Medicine | (_____)% | n. Research or Experimental | (_____)% |
   |---|---|---|---|---|---|
   | b. Counseling /<br>Family Planning | (_____)% | i. Medical | (_____)% | o. Senile or Aged | (_____)% |
   | c. Communicable | (_____)% | j. Mentally Retarded | (_____)% | p. Stress Testing | (_____)% |
   | d. Dental | (_____)% | k. Obstetrical | (_____)% | q. Surgical | (_____)% |
   | e. Drug Addicts | (_____)% | l. Pediatric | (_____)% | r. Tubercular | (_____)% |
   | f. General | (_____)% | m. Psychiatric | (_____)% | s. Other  Inmates | (100)% |
   | g. Hemodialysis | (_____)% | | | | |

10. a. List the number and type of applicant's employees and volunteers: If None, State None.   see attached reports

| Number | Type of Profession | Number | Type of Profession |
|--------|-------------------|--------|-------------------|
| 1) _____ | Inhalation Therapists | 9) _____ | Perfusionists |
| 2) _____ | Laboratory Technicians | 10) _____ | Pharmacists |
| 3) _____ | Nurse Anesthetists | 11) _____ | Physicians – Minor Surgery |
| 4) _____ | Nurses, Licensed Practical | 12) _____ | Physicians – No Surgery |
| 5) _____ | Nurse Practitioner | 13) _____ | Physiotherapists |
| 6) _____ | Nurses Registered | 14) _____ | Social Workers |
| 7) _____ | Opticians | 15) _____ | Speech Therapists |
| 8) _____ | Optometrists | 16) _____ | Other |

b. List the number and type of independent contractors who provide professional services on behalf of the applicant.

If None, State None      See attached reports

c. Are all the above individuals licensed in accordance with applicable state and federal regulations?   Yes ☒   No ☐

ATTACH DETAILED EXPLANATION FOR ANY "YES" ANSWERS:

Has the applicant or have any of the above employees:

1) Ever been the subject of disciplinary or investigative proceedings or reprimand by a governmental or administrative agency, hospital or professional association?   Yes ☐   No ☒

2) Ever been convicted for an act committed in violation of any law or ordinance other than traffic offenses?   Yes ☒   No ☐

3) Ever been treated for alcoholism or drug addiction?   Yes ☒   No ☐

4) Ever had any state professional license or license to prescribe or dispense narcotics refused, suspended, revoked, renewal refused or accepted only on special terms or ever voluntarily surrendered same?   Yes ☒   No ☐

11. Does the applicant perform:

a. Acupuncture or acupuncture anesthesia? Explain:   Yes ☐   No ☒

b. Angiography/Arteriography/Venography? Describe:   Yes ☐   No ☒

c. Catheterization (other than urinary or umbilical)? Describe:   Yes ☐   No ☒

d. Closed reduction of compound fractures and/or normal deliveries and/or dermabrasion?   Yes ☐   No ☒

e. Injection of radioisotopes and/or use of irradiated substances? Describe:   Yes ☐   No ☒

f. Radiation Therapy and/or Chemotherapy? Describe:   Yes ☐   No ☒

g. Psychiatric shock therapy?   Yes ☐   No ☒

h. Silicone Injections? Describe:   Yes ☐   No ☒

i. Spinal Anesthesia (other than saddle blocks or caudals)?   Yes ☐   No ☒

j. Laser Treatment? Describe:   Yes ☐   No ☒

RSG 50026 0209

12. Does the applicant perform any:

   a. Surgery other than incision of superficial boils or suturing superficial fascia?    Yes ☐ No ☒

   b. Circumcisions and/or dilation and curettage and/or insertion of temporary pacemakers?    Yes ☐ No ☒

   c. Tonsillectomies and/or Adenoidectomies and/or Caesarean Sections?    Yes ☐ No ☒

   d. Cosmetic Plastic Surgery? Describe _____    Yes ☐ No ☒

   e. Excision of large cysts and/or I&D of deep-seated boils or carbuncles?    Yes ☐ No ☒

   f. Hysterectomies?    Yes ☐ No ☒

   g. Open reduction of fractures? Describe: _____    Yes ☐ No ☒

   h. Surgery for weight reduction of patients?
   i. Abortions and/or menstrual extractions? Describe (include trimester, method and number of Abortions performed per month): _____    Yes ☐ No ☒

   j. Silicone Implants? Describe: _____    Yes ☐ No ☒

   k. Sterilization Procedures? Describe: _____    Yes ☐ No ☒

   l. Biopsies and/or endoscopies? List types performed: _____    Yes ☐ No ☒

   m. Sex change operations? Describe and advise the number performed per year: _____    Yes ☐ No ☒

   n. Other Surgery? Describe: _____    Yes ☐ No ☒

13. Does the applicant perform hospital emergency room care?

   a. For its own regular patients?    Yes ☐ No ☒

   b. For patients not its own?    Yes ☐ No ☒

   c. If answer to b. is yes, please specify: the percentage of its time devoted to this work = (_____)%, the number of hours per month devoted to this work = (_____) hrs.

14. Does the applicant use drugs for weight reduction patients?    Yes ☐ No ☒
If yes, on last page list drugs used and advise: percent of practice devoted to weight reduction, frequency and duration of prescriptions for weight reduction drugs and quantity dispensed by applicant?

15. Does the applicant administer any methadone treatment?    Yes ☐ No ☒
If yes, describe treatment and controls used and indicate number of treatments during last 12 months (_____), next 12 months (_____).

16. Is anesthesia (other than topical or by means of local infiltration) administered by either applicant or others?    Yes ☐ No ☒

   If yes, attached detailed explanation.

17. Does the applicant maintain any beds for overnight occupancy?    Yes ☐ No ☒

   If yes, total number: _____

18. State number of X-ray machines owned or operated and whether they are used for diagnosis or treatment or both.
State by whom treatment is given and number of procedures:    7 x-ray machines used by dentists in dental suites to diagnose, Number of procedures is unknown.

19. Does the applicant own (wholly or in part), operate or administer any hospital, nursing home or other institution where medical services are customarily rendered?    Yes ☐    No ☒

   If yes, give details, including name, location, size and number of beds _____

20. State sources and amounts of total revenue:

| | Source | Amount Last Policy Year | Ext. Amount This Policy Year |
|---|---|---|---|
| a. | Charitable Contributions | $ See attached financials | $ |
| b. | Government Funding | $ | $ |
| c. | Fee for Services | $ | $ |
| d. | _____ | $ | $ |
| e. | _____ | $ | $ |
| | TOTAL GROSS REVENUE: | $ | $ |

21. Number of patient encounters last 12 months (600,000) and/or patient tests carried out (_____).

   (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

22. Number of estimated patient encounters next 12 months (1.2M) and/or patient tests carried out (_____).

   (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

23. If applicant has a training school, complete the following.

| Specify profession for which students are being trained | Max. No. of students per session | No. of sessions per year | % of Time involved in clinical setting | Number of students | Qualifications of faculty (eg. MD, RN, PhD) |
|---|---|---|---|---|---|
| not applicable | | | | | |

24. If applicant is an ambulance service, please complete the following.

   Number of Ground Ambulances    not applicable    Number of Emergency Calls (per year) _____

   Number of Air Ambulances _____    Number of non-Emergency Calls (per year) _____

   Radius of Services _____

25. Give Professional Liability Coverage for last five years for the firm:

| Carrier | Limit | Deducible | Premium | Expiration (Mo/Day/Yr) |
|---|---|---|---|---|
| Landmark/RSUI | $1M/$3M/10M Aggregate | $50,000 | | 11/15/2014 |
| AWAC | $1M/$3M/$15M Aggregate | $50,000 | | 11/15/2013 |
| AWAC | $1M/$3M/$15M Aggregate | $50,000 | | 10/1/2012 |
| AWAC | $1M/$3M/$15M Aggregate | $50,000 | | 10/1/2011 |
| Lexington | $1M/$10M Aggregate | $50,000 | | 10/1/2010 |

   If expiring insurance is a claims made policy, what is the retroactive date?    11/15/13 _____

RSG 50026 0209

26. Is the applicant currently insured under a Commercial General Liability Policy?     Yes ☒     No ☐

If yes, please give details:

| Insurance Company | Type of Coverage | Limits BI | Limits PD | From | To |
|---|---|---|---|---|---|
| RSUI/Landmark | PL/GL | $1M | $3M | 11/15/13 | 11/15/14 |

27  Has any application for Professional Liability Insurance made on behalf of the firm, any predecessors in business or present partners ever been declined or has the insurance ever been cancelled or renewal refused?     Yes ☒     No ☐

If yes, please give details:  Allied World refused to renew

28. Has any claim ever been made against the applicant or any persons named in question 1?     Yes ☒     No ☐

If yes, how many?    See attached

Please attach currently valued company loss runs for the past 5 years and details stating:
1) Date when claim was made; 2) date the act giving rise to the claim was committed; 3) name of the claimant; 4) nature of the claim; 5) amount involved including reserves; and 6) final disposition

29. Is the applicant aware of any circumstances which may result in any claim against the applicant or any persons named in question 1?     Yes ☒     No ☐

If yes, how many?    See attached

Please attach currently valued company loss runs for the past 5 years and details stating:
1) Date when claim was made; 2) date the act giving rise to the claim was committed; 3) name of the claimant; 4) nature of the claim; 5) amount involved including reserves; and 6) final disposition

30. Has any insurer cancelled or refused to renew any similar insurance during the past five years?     See item 27

31. Limits of Liability requested    $10M          Deductible    optional

32. Desired term of policy: From    11/15/14      To    11/15/15

**Representations**

The Applicant declares that the above statement and representations are true and correct, and that no facts have been suppressed or misstated. All written statements and materials furnished to the Company, in conjunction with this application will be incorporated by reference into this application and made part hereof.

This application does not bind the Applicant to buy, or the Company to issue the insurance, but it is agreed that this form shall be the basis of the contract should a policy be issued, and it will be attached to and made part of the policy. The undersigned Applicant declares that if the information supplied on this application changes between the dates of this application and the time when the policy is issued, the Applicant will immediately notify the company of such changes, and the Company may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

| Signature of the Applicant | Director of Insurance and Risk | 9/15/14 |
|---|---|---|
|  | Title | Date |

Producer

RSG 50026 0209

IN THE CIRCUIT COURT OF HOT SPRING COUNTY
CIVIL DIVISION

CRYSTAL MERRITT, on behalf of herself
and all other Arkansas Tax Payers                                         PLAINTIFFS

VS .

WELLPATH, LLC;  and,
THE ARKANSAS DEPARTMENT OF CORRECTIONS                    DEFENDANTS

<u>SUMMONS</u>

THE STATE OF ARKANSAS TO DEFENDANT:

THE ARKANSAS DEPARTMENT OF CORRECTIONS

A lawsuit has been filed against you.  The relief demanded is stated in the attached
Complaint.  Within 30 days after service of this Summons on you (not counting the day
you received it) — or 60 days if you are a federal institution, or you are incarcerated in any
jail, penitentiary, or other correctional facility in Arkansas — you must file with the Clerk
of this Court a written Answer to the Complaint or a Motion under Rule 12 of the Arkansas
Rules of Civil Procedure.

The Answer or Motion must also be served on the Plaintiff, or Plaintiff's attorney, whose
name and address is: **SUTTER & GILLHAM, P.L.L.C.,** 1501 N Pierce, Ste. 105, Little
Rock, AR 72207.

If you fail to respond within the applicable time period, judgment by default may be entered
against you for the relief demanded in the Complaint.

ADDITIONAL NOTICES INCLUDED: Summons and Complaint
_____

Address of Clerk's Office                          CLERK OF COURT
Hot Spring County Circuit Court Clerk
210 Locust Street
Post Office Box 1220
Malvern, Arkansas 72104–1220                       _____
                                                    Signature of Clerk or Deputy Clerk]

                                                    Date:_____
                                                    [SEAL]



**Case Title:**        CRYSTAL MERRITT V WELPATH, LLC

**Case Number:**    30CV-23-39

**Type:**              SUMMONS - FILER PREPARED


So Ordered

_Casandra Oden_

_____

CASANDRA ODEN


Electronically signed by CJODEN on 2023-02-02 15:52:25     page 2 of 2

## IN THE CIRCUIT COURT OF HOT SPRING COUNTY
### CIVIL DIVISION

**CRYSTAL MERRITT, on behalf of herself
and all other Arkansas Tax Payers**                                    **PLAINTIFFS**

**VS** .

**WELLPATH, LLC;  and,
THE ARKANSAS DEPARTMENT OF CORRECTIONS**                **DEFENDANTS**

<u>SUMMONS</u>

THE STATE OF ARKANSAS TO DEFENDANT:

**WELLPATH, LLC**

A lawsuit has been filed against you.  The relief demanded is stated in the attached Complaint.  Within 30 days after service of this Summons on you (not counting the day you received it) — or 60 days if you are a federal institution, or you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the Clerk of this Court a written Answer to the Complaint or a Motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The Answer or Motion must also be served on the Plaintiff, or Plaintiff's attorney, whose name and address is: **SUTTER & GILLHAM, P.L.L.C.,** 1501 N Pierce, Ste. 105, Little Rock, AR 72207.

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the Complaint.

ADDITIONAL NOTICES INCLUDED: Summons and Complaint

_____

Address of Clerk's Office                          CLERK OF COURT
Hot Spring County Circuit Court Clerk
210 Locust Street
Post Office Box 1220                               _____
Malvern, Arkansas 72104–1220
                                                  Signature of Clerk or Deputy Clerk]

                                                  Date:_____
                                                  [SEAL]



**Case Title:**        CRYSTAL MERRITT V WELPATH, LLC

**Case Number:**    30CV-23-39

**Type:**                  SUMMONS - FILER PREPARED


So Ordered

_____

CASANDRA ODEN


Electronically signed by CJODEN on 2023-02-02 15:52:26      page 2 of 2